[No. S094710. July 29, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT NEAL ANDERSON, Defendant and Appellant.

**COUNSEL**

Neoma D. Kenwood, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin, Gerald A. Engler and Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—Over two centuries ago, William Blackstone, the great commentator on the common law, said that duress is no excuse for killing an innocent person: "And, therefore, though a man be violently assaulted, and hath no other possible means of escaping death, but by killing an innocent person, this fear and force shall not acquit him of murder; for he ought rather to die himself than escape by the murder of an innocent." (2 Jones's Blackstone (1916) p. 2197.)

We granted review to decide whether these words apply in California. We conclude that, as in Blackstone's England, so today in California: fear for one's own life does not justify killing an innocent person. Duress is not a defense to murder. We also conclude that duress cannot reduce murder to manslaughter. Although one may debate whether a killing under duress should be manslaughter rather than murder, if a new form of manslaughter is to be created, the Legislature, not this court, should do it.

## I. THE FACTS AND PROCEDURAL HISTORY

Defendant was charged with kidnapping and murdering Margaret Armstrong in a camp area near Eureka called the South Jetty. Defendant and others apparently suspected the victim of molesting two girls who resided in the camp. Ron Kiern, the father of one of the girls, pleaded guilty to Armstrong's second degree murder and testified at defendant's trial.

The prosecution evidence showed that a group of people, including defendant and Kiern, confronted Armstrong at the camp. Members of the group dragged Armstrong to a nearby field, beat her, put duct tape over her mouth, tied her naked to a bush, and abandoned her. Later, defendant and Kiern, in Kiern's car, saw Armstrong going naked down the street away from the jetty. The two grabbed Armstrong, forced her into the car, and drove away.

They then put Armstrong into a sleeping bag, wrapped the bag with duct tape, and placed her, screaming, into the trunk of Kiern's car.

Witnesses testified that defendant picked up a large rock, brought it to the trunk, and handed it to Kiern. Kiern appeared to hit Armstrong with the rock, silencing her. Kiern testified that defendant said Armstrong had to die. After they put her into the trunk, defendant dropped a small boulder onto her head. Kiern also said that defendant picked up the rock again, handed it to Kiern, and told him to drop it on Armstrong or something would happen to his family. Kiern dropped the rock but believed it missed Armstrong. Kiern and defendant later commented to others that Armstrong was dead.

The evidence indicated that defendant and Kiern disposed of Armstrong's body by rolling it down a ravine. One witness testified that Kiern stated he had stepped on her neck until it crunched to ensure she was dead before putting her in the ravine. The body was never found.

Defendant testified on his own behalf. He said he had tried to convince Kiern to take Armstrong to the hospital after she had been beaten. When he and Kiern saw her going down the road beaten and naked, Kiern grabbed her and put her in the backseat of the car. Back at camp, Kiern put Armstrong in the sleeping bag and bound it with duct tape. At Kiern's instruction, defendant opened the trunk and Kiern put Armstrong inside. Kiern told defendant to retrieve a certain rock the size of a cantaloupe. Defendant said, "Man, you are out of your mind for something like that." Kiern responded, "Give me the rock or I'll beat the shit out of you." Defendant gave him the rock because Kiern was bigger than he and he was "not in shape" to fight. When asked what he thought Kiern would have done if he had said no, defendant replied: "Punch me out, break my back, break my neck. Who knows." Kiern hit Armstrong over the head with the rock two or three times. Kiern's wife was standing there yelling, "Kill the bitch."

Defendant testified that later they left in Kiern's car. They pulled over and Kiern opened the trunk. Armstrong was still moaning and moving around. Defendant tried to convince Kiern to take her to a hospital, but Kiern refused. Defendant got back into the car. A few minutes later, Kiern closed the trunk, got in the car, and said, "She's dead now. I stomped on her neck and broke it."

A jury convicted defendant of first degree murder and kidnapping. Based primarily on his testimony that Kiern threatened to "beat the shit out of" him, defendant contended on appeal that the trial court erred in refusing to instruct the jury on duress as a defense to the murder charge. The Court of

Appeal concluded that duress is not a defense to first degree murder and affirmed the judgment. We granted defendant's petition for review to decide to what extent, if any, duress is a defense to a homicide-related crime, and, if it is a defense, whether the trial court prejudicially erred in refusing a duress instruction.

## II. Discussion

### A. *Whether Duress Is a Defense to Murder*

■ At common law, the general rule was, and still is today, what Blackstone stated: duress is no defense to killing an innocent person.[1] "Stemming from antiquity, the nearly 'unbroken tradition' of Anglo-American common law is that duress never excuses murder, that the person threatened with his own demise 'ought rather to die himself, than escape by the murder of an innocent.'" (Dressler, *Exegesis of the Law of Duress: Justifying the Excuse and Searching for Its Proper Limits* (1989) 62 So.Cal. L.Rev. 1331, 1370, fns. omitted; see also *id.* at p. 1343 & fn. 83, and cases cited.)[2]

The basic rationale behind allowing the defense of duress for other crimes "is that, for reasons of social policy, it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person." (LaFave, Criminal Law, *supra*, § 5.3, p. 467.) This rationale, however, "is strained when a defendant is confronted with taking the life of an innocent third person in the face of a threat on his own life. . . . When the defendant commits murder under duress, the resulting harm—i.e. the death of an innocent person—is at least as great as the threatened harm—i.e. the death of the defendant." (*U.S. v. LaFleur, supra,* 971 F.2d at p. 205.) We might add that, when confronted with an apparent kill-an-innocent-person-or-be-killed situation, a person can always choose to resist. As a practical matter, death will rarely, if ever, inevitably result from a choice not to kill. The law should require people to choose to resist rather than kill an innocent person.

A state may, of course, modify the common law rule by statute. The Model Penal Code, for example, does not exclude murder from the duress

[1] By "innocent," we mean merely that the person did not cause the duress, not that the person has never committed a crime.

[2] See also Perkins and Boyce, Criminal Law (3d ed. 1982) chapter 9, section 2, page 1058 ("For the most part today, as at common law, one is not excused for the intentional killing of an obviously innocent person, even if it was necessary to save oneself from death."); LaFave, Criminal Law (3d ed. 2000) section 5.3(b), pages 468-469; Annotation, Coercion, Compulsion, or Duress as Defense to Criminal Prosecution (1955) 40 A.L.R.2d 908, 909 ("[I]t appears to be generally accepted that coercion or duress may be a defense to all crimes except taking the life of an innocent person"); *U.S. v. LaFleur* (9th Cir. 1991) 971 F.2d 200, 205, and cases cited.

defense. (See LaFave, Criminal Law, *supra*, § 5.3(b), p. 469, fn. 13.) Defendant contends the California Legislature modified the rule in the 19th century and made duress a defense to some murders.

Since its adoption in 1872, Penal Code section 26[3] has provided: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] . . . Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats of menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." Defendant contends the reference to a "crime . . . punishable with death" means that the crimes to which duress is not a defense include only those forms of murder that are punishable with death, and that these forms change with changes in death penalty law. In 1872, when the current Penal Code was adopted, all first degree murder was punishable with death. (*People v. Green* (1956) 47 Cal.2d 209, 218 [302 P.2d 307].) Today only first degree murder with special circumstances is so punishable. (§§ 190, subd. (a), 190.2, subd. (a).) Accordingly, defendant contends that today, duress is a defense to all murder except first degree murder with special circumstances. In effect, he argues that a killing under duress is either first degree murder with special circumstances or no crime at all. Because the prosecution did not allege special circumstances in this case, he continues, duress provides a full defense.

The sparse relevant California case law is inconclusive. In *People v. Martin* (1910) 13 Cal.App. 96, 102 [108 P. 1034], the court noted that "[i]t has ever been the rule that necessity is no excuse for killing an innocent person." It cited but did not construe section 26 and ultimately found duress was not available under the facts because the person was not in immediate danger. (*People v. Martin, supra,* at pp. 102-103.) In both *People v. Son* (2000) 79 Cal.App.4th 224, 232-233 [93 Cal.Rptr.2d 871], and *People v. Petro* (1936) 13 Cal.App.2d 245, 247-248 [56 P.2d 984], the court cited section 26 and stated that duress was not available as a defense, but in each case the defendant had been convicted of a form of murder then punishable with death. In *People v. Moran* (1974) 39 Cal.App.3d 398 [114 Cal.Rptr. 413], the court stated in dicta, without analysis, that our decision in *People v. Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], which had declared unconstitutional the death penalty law then in effect, "rendered meaningless the exception pertaining to capital crimes of Penal Code section 26," and therefore "the defense of compulsion was available to defendant at the time of trial." (*People v. Moran, supra,* at p. 417; see also *Tapia v. Roe* (9th Cir. 1999) 189 F.3d 1052, 1057 [dicta stating, without analysis, that

---

[3]All further statutory references are to the Penal Code unless otherwise indicated.

under California law, "duress can excuse crimes, including murder without special circumstances"].) Citing section 26, Witkin states, "The defense of coercion is generally held unavailable where the crime is homicide; i.e., the threat even of death to oneself does not excuse the killing of another innocent person." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 54, p. 390.)

In this case, the Court of Appeal concluded that, because all first degree murders were punishable with death in 1872, when section 26 was enacted, duress is not a defense to any first degree murder. In effect, the court concluded that section 26's exception for a "crime . . . punishable with death" includes any crime punishable with death as of 1872 unaffected by later changes in death penalty law. As we explain, we agree, except that the Court of Appeal did not go back far enough in time. The exception for a crime punishable with death refers to a crime punishable with death as of *1850*, not 1872. Section 26 derives from section 10 of the original 1850 Act Concerning Crimes and Punishments, which similarly excepted a crime "punishable with death" from the duress defense.[4] Section 5, enacted as part of the original Penal Code in 1872 and unchanged since, provides: "The provisions of this Code, so far as they are substantially the same as existing statutes, must be construed as continuations thereof, and not as new enactments." As relevant, section 26 was merely a continuation of the then existing 1850 statute. For this reason, we must "begin . . . by inquiring into the intent of the Legislature in 1850 . . . ." (*Keeler v. Superior Court* (1970) 2 Cal.3d 619, 625 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420] [applying § 5 to § 187].)

In 1850, all murder was punishable with death. (Stats. 1850, ch. 99, § 21, p. 231.) Not until 1856 was murder divided into degrees, with death the punishment for first degree but not second degree murder. (Stats. 1856, ch. 139, § 2, p. 219.) This means that in 1850, duress was no defense to any murder. Thus, like many of California's early penal statutes (see, e.g., *People v. Davis* (1998) 19 Cal.4th 301, 304, fn. 1 [79 Cal.Rptr.2d 295, 965 P.2d 1165] [theft]; *Keeler v. Superior Court, supra,* 2 Cal.3d at pp. 624-625 [murder]), section 26 effectively adopted the common law, although the Legislature used a problematic method in which to do so. The question before us is whether the exception for a crime punishable with death changes

---

[4] The original 1850 statute provided: "A person committing a crime not punishable with death, under threats or menaces which sufficiently show that his or her life was in danger, or that he or she had reasonable cause to believe and did believe that his or her life was in danger, shall not be found guilty, and such threats or menaces being proved and established, the person or persons compelling by such threats or menaces the commission of the offence, shall be considered as principal or principals, and suffer the same punishment as if he or she had perpetrated the offence." (Stats. 1850, ch. 99, § 10, p. 230.)

with every change in death penalty law, which would mean that by 1872, the exception included only first degree murder and today it includes only first degree murder with special circumstances. We think not, for several reasons.

We see no suggestion that the 1850, or any, Legislature intended the substantive law of duress to fluctuate with every change in death penalty law. That interpretation would create strange anomalies. For example, special circumstances were added to the murder laws in the 1970's to conform California's death penalty law to the requirements of the United States Constitution. (*People v. Frierson* (1979) 25 Cal.3d 142, 173-175 [158 Cal.Rptr. 281, 599 P.2d 587].) Defendant's position would mean that constitutional death penalty jurisprudence would control the substantive law of duress, something we doubt the Legislature intended. Even more anomalously, defendant's position would mean that when the Legislature created special circumstances to give California a valid death penalty law, it simultaneously *expanded* the circumstances in which someone may kill an innocent person.

The presence or absence of special circumstances has no relationship to whether duress should be a defense to killing an innocent person. For example, because a prior murder conviction is a special circumstance (§ 190.2, subd. (a)(2)), defendant's position would mean that a person with a prior murder conviction who intentionally kills an innocent person under duress without premeditating commits no crime, but if the person premeditates, the killing is a capital crime. A person without the prior conviction committing the same premeditated killing would commit no crime unless some other special circumstance happened to attach, in which case the killing would be a capital crime. The Legislature can hardly have intended such random results.

Defendant's interpretation would also force prosecutors to charge special circumstances to prevent duress from becoming a defense. As the Court of Appeal said in this case, "a rule making the availability of the duress defense turn on the manner in which prosecutorial discretion is exercised is potentially pernicious, and may do an unnecessary disservice to criminal defendants. The decision of whether to seek the death penalty . . . should not be encumbered by tactical considerations, such as blocking anticipated defenses. The charging decision must be governed by more sagacious considerations than whether the punishment charged will deprive a defendant of a defense to the crime."

Other statutory provisions lead to the conclusion that, like the common law, section 26 excludes all murder from the duress defense. By itself,

section 26 (or its 1850 predecessor) is not clear whether the reference to a "crime" punishable with death means the crime of murder in all its forms or only those forms of murder punishable with death. But section 26 does not exist by itself. ■ A court does not determine the meaning of a statute from a single word or sentence but in context; provisions relating to the same subject must be harmonized to the extent possible. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Accordingly, a statute should be construed with reference to the whole system of law of which it is a part. (*Landrum v. Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352].) ■ When read in conjunction with other statutes, it becomes clear that section 26's reference to a "crime" means the crime of murder in general and not just those forms of murder punishable with death at any given time.

The original 1850 statute defining murder provided that the "punishment of any person convicted of the *crime of murder* shall be death." (Stats. 1850, ch. 99, § 21, p. 231, italics added.) The 1856 statute that divided murder into degrees, with death the punishment only for first degree murder—and thus, under defendant's position, the statute that first abrogated the common law of duress—referred to determining "the degree of the crime." (Stats. 1856, ch. 139, § 2, p. 219.) These statutes thus indicate that the "crime" was and remained "murder" even after it was divided into degrees.

Other statutes also indicate that the "crime" is "murder." Section 951 provides guidelines as to how to charge a crime in an information or indictment. It states the pleading may simply "giv[e] the name of the *crime, as murder, burglary, etc. . . . .*" (Italics added.) An accusatory pleading charging simply murder, without specifying the degree, is sufficient to charge any degree of murder. (*In re Walker* (1974) 10 Cal.3d 764, 781 [112 Cal.Rptr. 177, 518 P.2d 1129]; *People v. Mendez* (1945) 27 Cal.2d 20, 23 [161 P.2d 929].) Moreover, section 1157 provides that when "a defendant is convicted of a *crime . . . which is distinguished into degrees,*" the jury or court must find the degree of the crime. (Italics added.) Both sections 951 and 1157 were substantially identical in relevant respects in 1872, when section 26 was enacted. Section 1157 apparently has no antecedent before the 1872 Penal Code (but compare the 1856 law dividing murder into degrees, cited in the preceding paragraph [Stats. 1856, ch. 139, § 2, p. 219]), but section 951 derives from the 1850 law, which was similar as relevant here.[5] In accordance with these statutes, the information in this case charged defendant simply with the crime of "murder." The jury then found the crime to be first degree.

---

[5]As originally enacted in 1872, section 951 provided that the accusatory pleading might accuse the defendant "of the crime of (giving its legal appellation, such as murder, arson, or the like . . .) . . . ." The 1850 antecedent provided that an indictment might accuse the

Thus, sections 951 and 1157 provide that the "crime" is "murder." In light of those provisions, it is apparent that section 26 also refers to the "crime" of murder, not a particular form of murder. Indeed, we have explained that when, in 1856, the Legislature created the degrees of murder, it merely "divide[d] the crime of murder into two degrees . . . ." (*People v. Dillon* (1983) 34 Cal.3d 441, 466 [194 Cal.Rptr. 390, 668 P.2d 697].) Moreover, we have explained that a special circumstance, today necessary to permit the death penalty, is itself "not a 'crime,' and an element of a special circumstance thus is not an 'element of a crime.' " (*People v. Garcia* (1984) 36 Cal.3d 539, 552 [205 Cal.Rptr. 265, 684 P.2d 826].) Even when special circumstances are alleged, the substantive crime remains murder. Murder is punishable with death, although not all forms of murder are so punishable. Here, defendant was properly charged simply with murder. Hence, duress was no defense to that charge.

Other provisions of the Penal Code bolster this conclusion. Sections 195 and 197, both enacted in 1872, describe those situations in which homicide is excusable or justifiable. If the homicide is excusable or justifiable under these provisions, the person must be acquitted. (§ 199.) The original 1850 law had provisions comparable to, although somewhat different from, sections 195 and 197. (Stats. 1850, ch. 99, §§ 29-36, p. 232.) None of these provisions mention duress as excusing or justifying homicide. It is unreasonable to suppose the Legislature carefully described the situations in which homicide is excusable or justifiable in those provisions, but also intended to create by oblique implication in section 26 (or any other statute) yet another form of excusable or justifiable homicide, especially when doing so would abrogate the settled common law rule that duress is no defense to killing an innocent person.

Moreover, no reason appears for the Legislature to have silently abrogated the common law rule. The reasons for the rule applied as well to 19th-century California as to Blackstone's England. They apply, if anything, with greater force in California today. A person can always choose to resist rather than kill an innocent person. The law must encourage, even require, everyone to seek an alternative to killing. Crimes are often committed by more than one person; the criminal law must also, perhaps especially, deter those crimes. California today is tormented by gang violence. If duress is recognized as a defense to the killing of innocents, then a street or prison gang need only create an internal reign of terror and murder can be justified, at least by the actual killer. Persons who know they can claim duress will be

---

defendant "of the crime of (giving its legal appellation, such as *Murder, Arson, Manslaughter*, or the like . . .) . . . ." (Stats. 1850, ch. 119, § 259, p. 294, original italics.) As originally enacted in 1872, section 1157 referred to "a crime [that] is distinguished into degrees . . . ."

more likely to follow a gang order to kill instead of resisting than would those who know they must face the consequences of their acts. Accepting the duress defense for any form of murder would thus encourage killing. Absent a stronger indication than the language of section 26, we do not believe the Legislature intended to remove the sanctions of the criminal law from the killing of an innocent even under duress.

Defendant cites *In re Boyle* (1974) 11 Cal.3d 165 [113 Cal.Rptr. 99, 520 P.2d 723] as supporting his position. *Boyle* interpreted former California Constitution, article I, section 6, which then provided, "All persons shall be bailable by sufficient sureties, *unless for capital offenses* when the proof is evident or the presumption great." (Italics added.) We held that only when defendants are actually death eligible under the law applicable to that case are "capital offenses" involved within the meaning of this provision. *(In re Boyle, supra,* 11 Cal.3d at p. 167.) Other statutes involving procedural rules that depend on whether the case is a capital case have generally also been interpreted to apply only to actual capital cases under the applicable law. (E.g., former Pen. Code, § 1074, now Code Civ. Proc., § 229 [specifying grounds to challenge prospective jurors for cause]; Pen. Code, § 1095 [concerning the number of counsel permitted to argue]; Pen. Code, § 1272 [governing bail on appeal]; see *Ex Parte Wolff* (1880) 57 Cal. 94; see also 4 Witkin & Epstein, Cal. Criminal Law, *supra,* Pretrial Proceedings, § 82, pp. 281-282.) Defendant argues that because what is a capital offense for these purposes changes with changes in death penalty law, so too does the law of duress.

We do not believe that these procedural provisions govern the substantive law of duress. First, the procedural provisions generally use different terminology than section 26 or its predecessor, which refer to a "crime" punishable with death. The constitutional bail provision construed in *Boyle* referred to "capital offenses." *(In re Boyle, supra,* 11 Cal.3d at p. 167.) Former Penal Code section 1074, subdivision 8, provided, "If the offense charged be punishable with death . . . ." (The current Code Civ. Proc., § 229, subd. (h), uses substantially equivalent language.) As enacted in 1872, Penal Code section 1095 provided, "If the indictment is for an offense punishable with death . . . ." (It is substantially identical today.) The statutes governing bail at trial referred and still refer to someone "charged" with an "offense punishable with death" or a "capital offense." (Pen. Code, former § 1270, later § 1268a, now again § 1270; see also current § 1270.5.) The statute governing bail on appeal refers to "conviction of an offense not punishable with death . . . ." (Pen. Code, § 1272.) None of these provisions use the term "crime" and so shed no light on whether the 1850 or 1872 Legislature meant simply the "crime" of murder or only those forms of murder punishable with death at any given time. (An exception now exists. By a 1974

initiative, the electorate amended the constitutional bail provision so that it now refers to "[c]apital crimes," not offenses. [Cal. Const., art. I, § 12, as enacted Nov. 5, 1974.] This 1974 change does not help us determine what the Legislature intended in 1850 [or 1872].)

Moreover, without deciding how all procedural provisions should be interpreted, we note that it generally makes sense for the procedures prescribed for capital cases to apply only to an actual capital case—hence, what is a capital case logically varies as the Legislature changes the death penalty law. But the same rationale does not apply to questions of *substantive* criminal law. It makes no sense, and creates only anomalies, for the substantive law of duress to fluctuate with every change in substantive death penalty law including, as with special circumstances, changes constitutionally compelled for reasons irrelevant to the law of duress.

■ Defendant and the concurring and dissenting opinion cite the principle of statutory construction that where a reference to another law is specific, the reference is to that law as it then existed and not as subsequently modified, but where the reference is general, "such as . . . to a system or body of laws or to the general law relating to the subject in hand," the reference is to the law as it may be changed from time to time. (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58-59 [195 P.2d 1]; also quoted in *In re Jovan B.* (1993) 6 Cal.4th 801, 816 [25 Cal.Rptr.2d 428, 863 P.2d 673].) They argue that section 26's reference to a "crime . . . punishable with death" is general rather than specific. The question is not so clear. Section 26 does not cite specific statutes, but the subject of crimes punishable with death is quite specific. It is, for example, far narrower than the reference that the *Palermo* court found to be *specific* for this purpose: " 'any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject.' " (*Palermo v. Stockton Theatres, Inc., supra*, 32 Cal.2d at pp. 59-60.) In any event, when the statutory words themselves "do not make clear whether [the statute] contemplates only a time-specific incorporation, 'the determining factor will be . . . legislative intent . . . .' " (*In re Jovan B., supra*, at p. 816.) Here, for the reasons stated, we believe the Legislature intended to refer to crimes punishable with death as they existed in 1850.

■ The concurring and dissenting opinion also argues that duress especially should be a defense to implied-malice second degree murder. It evokes the image of an innocent person who is forced at gunpoint by fleeing armed robbers to drive recklessly, and who is then charged with murder when a fatal accident ensues. In reality, the situation is not so grim. Although duress is not an affirmative defense to murder, the circumstances

of duress would certainly be relevant to whether the evidence establishes the elements of implied malice murder. The reasons a person acted in a certain way, including threats of death, are highly relevant to whether the person acted with a conscious or wanton disregard for human life. (*People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) This is not due to a special doctrine of duress but to the requirements of implied malice murder.

Defendant argues that the rule of lenity compels a different result. (See *People v. Avery* (2002) 27 Cal.4th 49, 57-58 [115 Cal.Rptr.2d 403, 38 P.3d 1].) We disagree. ■ As explained in *Avery*, the rule of lenity compels courts to resolve true statutory ambiguities in a defendant's favor, but this rule applies only if two reasonable interpretations of the statute stand in relative equipoise. Courts should not strain to interpret a penal statute in a defendant's favor if they can fairly discern a contrary legislative intent. Here, for the reasons stated, the possible interpretations of section 26 do not stand in relative equipoise. Reasonably construed, section 26 preserves the common law rule that duress is not a defense to murder.

Defendant also cites legislative inaction in support of his position. The Legislature amended section 26 in 1976 and again in 1981, both times to delete a class of persons that the original statute had made incapable of committing crimes. (Stats. 1976, ch. 1181, § 1, p. 5285 [deleting the class of married women acting under threats by their husbands]; Stats. 1981, ch. 404, § 3, p. 1592 [deleting the class of "lunatics and insane persons"].) Defendant argues that because the Legislature did not also amend the provision relating to duress, it "made the decision that not only should not all murderers be eligible for the penalty of death, but not all should be deprived of the defense of duress." Again, we disagree. "To be sure, where the Legislature amends a statute without altering a consistent and long-standing judicial interpretation of its operative language, courts generally indulge in a presumption that the Legislature has ratified that interpretation." (*People v. Escobar* (1992) 3 Cal.4th 740, 750-751 [12 Cal.Rptr.2d 586, 837 P.2d 1100].) But legislative inaction is a weak indication of intent at best; it is generally more fruitful to examine what the Legislature has done rather than not done. (*Id.* at p. 751.) Here, there is no indication the Legislature even considered duress when it amended section 26 in other areas. Moreover, when it did amend the section, there was no long-standing and consistent judicial interpretation that duress was a defense to some but not all murder, only fleeting dicta in a single intermediate appellate court decision that duress was a defense to all murder when there was no death penalty.

■ Accordingly, we conclude that duress is not a defense to any form of murder.

## B. *Whether Duress Can Reduce Murder to a Lesser Crime*

 Defendant also argues that even if duress is not a complete defense to murder, at least it reduces the crime to manslaughter by negating malice.

"Manslaughter is 'the unlawful killing of a human being without malice.' (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense (see *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *People v. Flannel* [(1979)] 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]).' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88 [96 Cal.Rptr.2d 451, 999 P.2d 675].) Neither of these two circumstances describes the killing of an innocent person under duress. Nevertheless, defendant argues that we should make duress a third way in which a defendant lacks malice.

No California case has recognized the killing of an innocent person under duress as a form of manslaughter. Some states have provided by statute that a killing under duress is manslaughter. (See Perkins & Boyce, Criminal Law, *supra*, ch. 9, § 2, p. 1058 & fn. 18; LaFave, Criminal Law, *supra*, § 7.11(c), pp. 719-720.) But California has not done so. The cases that have considered the question absent a statute have generally rejected the argument that duress can reduce murder to manslaughter. (E.g., *U.S. v. LaFleur, supra,* 971 F.2d at p. 206; *State v. Nargashian* (1904) 26 R.I. 299 [58 A. 953, 955] [often cited as a leading case on the subject]; contra, *Wentworth v. State* (1975) 29 Md.App. 110 [349 A.2d 421, 428].) Relying heavily on *People v. Flannel, supra,* 25 Cal.3d 668, and legal commentators, defendant argues that this court should do what the Legislature has not done: recognize a killing under duress as a form of manslaughter.

Some commentators do, indeed, argue that fear for one's own life, although not justifying the killing of an innocent, should at least mitigate murder to manslaughter. "[T]he holding that a killing in such an extremity is necessarily murder has not been adequately considered. While moral considerations require the rejection of any claim of excuse, they do not require that the mitigation of the circumstances be overlooked. A killing in such an extremity is far removed from cold-blooded murder, and should be held to be manslaughter." (Perkins & Boyce, Criminal Law, *supra*, ch. 9, § 2, p. 1058.) "[I]t is arguable that [a defendant's] crime should be manslaughter rather than murder, on the theory that the pressure upon him, although not enough to justify his act, should serve at least to mitigate it to something less than murder." (LaFave, Criminal Law, *supra*, § 7.11(c), p. 719.)

This court has never decided the question. (See *People v. Bacigalupo* (1991) 1 Cal.4th 103, 124-125 [2 Cal.Rptr.2d 335, 820 P.2d 559] [concluding only that any error in not giving duress instructions was harmless]; *People v. Beardslee* (1991) 53 Cal.3d 68, 86 [279 Cal.Rptr. 276, 806 P.2d 1311] [not deciding "what relevance, if any," *People v. Flannel, supra,* 25 Cal.3d 668, has in the duress context].) The problem with making a killing under duress a form of manslaughter is that no statute so provides. The difference between murder and manslaughter "is that murder includes, but manslaughter lacks, the element of malice." (*People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) Both forms of voluntary manslaughter currently recognized—provocation and imperfect self-defense—are grounded in statutory language. The provocation form of manslaughter is obviously based on statute. Section 192 "specif[ies] that an unlawful killing that lacks malice because committed 'upon a sudden quarrel or heat of passion' is voluntary manslaughter." (*People v. Rios, supra,* 23 Cal.4th at p. 461; see also § 188 [malice is "implied, when no considerable provocation appears"].)

Although less obviously, the imperfect self-defense form of manslaughter is also based on statute. *People v. Flannel, supra,* 25 Cal.3d 668, the leading case developing the doctrine, "had two *independent* premises: (1) the notion of mental capacity . . . and (2) a grounding in both well-developed common law and in the statutory requirement of malice (Pen. Code, § 187)." (*In re Christian S., supra,* 7 Cal.4th at p. 777.) In 1981, the Legislature abolished diminished capacity, thus making the first premise no longer valid. (*Ibid.*) But the second premise remains valid. (*Ibid.*) Express malice exists "when there is manifested a deliberate intention *unlawfully* to take away the life of a fellow creature." (§ 188, italics added.) A killing in self-defense is *lawful.* Hence, a person who actually, albeit unreasonably, believes it is necessary to kill in self-defense intends to kill lawfully, not unlawfully. "A person who actually believes in the need for self-defense necessarily believes he is acting lawfully." (*In re Christian S., supra,* 7 Cal.4th at p. 778.) Because express malice requires an intent to kill unlawfully, a killing in the belief that one is acting lawfully is not malicious. The statutory definition of implied malice does not contain similar language, but we have extended the imperfect self-defense rationale to any killing that would otherwise have malice, whether express or implied. "[T]here is no valid reason to distinguish between those killings that, absent unreasonable self-defense, would be murder with express malice, and those killings that, absent unreasonable self-defense, would be murder with implied malice." (*People v. Blakeley, supra,* 23 Cal.4th at p. 89.)

Defendant's reliance on *People v. Flannel, supra,* 25 Cal.3d 668, and its recognition of unreasonable self-defense as a form of manslaughter, is thus

misplaced. A killing in self-defense is lawful, but a killing of an innocent person under duress is unlawful. In contrast to a person killing in imperfect self-defense, a person who kills an innocent believing it necessary to save the killer's own life intends to kill unlawfully, not lawfully. Nothing in the statutes negates malice in that situation. Recognizing killing under duress as manslaughter would create a new form of manslaughter, which is for the Legislature, not courts, to do.

When this court developed the doctrine of diminished capacity as a form of manslaughter, we rejected the argument that we were improperly creating a nonstatutory crime: "In *People v. Conley* [(1966)] 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], we pointed out that section 192 had been adopted before the concept of diminished capacity had been developed and therefore that section's enumeration of nonmalicious criminal homicides could not be considered exclusive. We did not thereby create a 'non statutory crime,' nor could we do so consistently with Penal Code section 6. Rather we gave effect to the *statutory* definition of manslaughter by recognizing that factors other than sudden quarrel or heat of passion may render a person incapable of harboring malice." (*People v. Mosher* (1969) 1 Cal.3d 379, 385, fn. 1 [82 Cal.Rptr. 379, 461 P.2d 659].) This justification of diminished capacity does not apply to duress. Sections 26, 187, and 192, all enacted in 1872 and unchanged since as far as duress is concerned, postdate the development of the law that duress does not justify killing an innocent person. Moreover, the Legislature has now abolished the doctrine of diminished capacity. (*In re Christian S., supra*, 7 Cal.4th at p. 774; *People v. Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Thus, we see no basis on which to create a new, nonstatutory, form of voluntary manslaughter.

Two other circumstances also point to this conclusion. First, section 190.3 lists factors a jury should consider in deciding whether to impose the death penalty when the defendant has been convicted of first degree murder with special circumstances. Among the factors is whether the defendant "acted under extreme duress . . . ." (§ 190.3, factor (g).) This provision implies that a person acting even "under extreme duress" may be convicted of first degree murder with special circumstances, an implication inconsistent with the notion that duress reduces what would otherwise be murder to manslaughter. Second, recognizing that duress could reduce murder to manslaughter would create a conundrum with no obvious solution. Manslaughter has always been a separate crime from murder. Both section 187, defining murder, and section 192, defining manslaughter, were enacted in 1872. They derive from the 1850 law. (Stats. 1850, ch. 99, §§ 19-26, p. 231.) But manslaughter has never been punishable by death. If a killing under duress

were a form of manslaughter, it would seem that the same duress would then provide a *defense* to manslaughter. Thus, duress would become a complete defense to murder by a two-step process: first, duress would reduce murder to manslaughter; second, duress would supply a defense to that manslaughter. These problems are for the Legislature to sort out if it should choose to do so.

We recognize that policy arguments can be made that a killing out of fear for one's own life, although not justified, should be a crime less than the same killing without such fear. On the other hand, because duress can often arise in a criminal gang context, the Legislature might be reluctant to do anything to reduce the current law's deterrent effect on gang violence. These policy questions are for the Legislature, not a court, to decide. Accordingly, we reject defendant's argument that we should create a new form of voluntary manslaughter. His arguments are better directed to the Legislature.

 Defendant also argues that, at least, duress can negate premeditation and deliberation, thus resulting in second degree and not first degree murder. We agree that a killing under duress, like any killing, may or may not be premeditated, depending on the circumstances. If a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder. As with implied malice murder, this circumstance is not due to a special doctrine of duress but to the legal requirements of first degree murder. The trial court instructed the jury on the requirements for first degree murder. It specifically instructed that a killing "upon a sudden heat of passion or *other condition precluding the idea of deliberation*" would not be premeditated first degree murder. (Italics added.) Here, the jury found premeditation. In some other case, it might not. It is for the jury to decide. But, unless and until the Legislature decides otherwise, a malicious, premeditated killing, even under duress, is first degree murder.

On a final point, we note, contrary to the Attorney General's argument, that duress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. (See *People v. Anderson* (1991) 233 Cal.App.3d 1646, 1666-1667, fn. 18 [285 Cal.Rptr. 523]; Perkins & Boyce, Criminal Law, *supra*, ch. 9, § 2, pp. 1058-1059; LaFave, Criminal Law, *supra*, § 5.3(b), pp. 468-469.) If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony. Here, for example, the court instructed the jury that duress could be a defense to the kidnapping charge. It also instructed on felony murder with kidnapping as the underlying felony. If the jury had found defendant not guilty of kidnapping due to duress (it did not), it could not have found that he killed during the commission of that kidnapping. Defendant could not have killed during the perpetration of a crime of which he was innocent.

Our conclusion that duress is no defense to murder makes it unnecessary to decide whether the evidence would have warranted duress instructions in this case.

### III. CONCLUSION

We affirm the judgment of the Court of Appeal.

George, C. J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—Under California law, the death penalty may be imposed for the crime of murder only if the murder is of the first degree and committed with one or more of the statutorily defined special circumstances. (Pen. Code, §§ 190, 190.2.) California law allows a person accused of crime to defend against any criminal charge on the ground that the defendant acted under duress "unless the crime be punishable with death." (*Id.*, § 26, subd. Six.) Here, defendant contends that, because the death penalty may not be imposed for second degree murder, the trial court erred in not instructing the jury that duress, if proven, was a complete defense to second degree murder.

The majority concludes that the trial court did not err because, under California law, duress is not a defense to second degree murder, or to any form of murder, whether or not the particular form of murder is punishable by death. I disagree. Applying established rules of statutory construction, I would hold that duress is unavailable as a defense only when the offense is capital murder—that is, first degree murder with a special circumstance— and that duress is available as a defense to all noncapital forms of murder, including murder in the second degree. Because no substantial evidence of duress was presented here, however, I agree with the majority that defendant was not entitled to have the trial court instruct the jury on that defense.

### I

When deciding what a statute means, courts seek to determine what effect the legislative body that enacted it intended to achieve. (*People v. Trevino* (2001) 26 Cal.4th 237, 240 [109 Cal.Rptr.2d 567, 27 P.3d 283].) To make this determination, courts begin with the text of the statute, because the words used are the best evidence of legislative intent. (*Id.* at p. 241; see also *Holloway v. United States* (1999) 526 U.S. 1, 6 [119 S.Ct. 966, 969, 143 L.Ed.2d 1].) Unless there is reason to believe that a special or technical meaning was intended, courts give the words of the statute their usual,

ordinary meaning. (*People v. Trevino, supra,* at p. 241.) If the statutory text, viewed in light of the ordinary meaning of its words, is not ambiguous, courts usually accept this meaning as the proper construction of the statute without further inquiry. (*People v. Gardeley* (1996) 14 Cal.4th .605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) If the statutory text is ambiguous, however, courts examine the context of the statute and consider its legislative history and the historical circumstances of its enactment to arrive at the interpretation that is most likely to reflect legislative intent. (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1152 [69 Cal.Rptr.2d 329, 947 P.2d 291].)

Here, the provision to be construed, subdivision Six of Penal Code section 26 (section 26), includes among the persons who are incapable of committing crimes "[p]ersons (*unless the crime be punishable with death*) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (Italics added.) As applied to the crime of murder, the italicized phrase is ambiguous because some but not all forms of murder are punishable by death.

The crime of murder is divided into first degree murder and second degree murder. (Pen. Code, § 189.) Second degree murder is never punishable by death, and first degree murder is punishable by death only if committed under one or more special circumstances. (*Id.,* §§ 190, 190.2; see *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467-470 [24 Cal.Rptr.2d 808, 862 P.2d 808] [describing California death penalty law].) This court has stated that "[i]n the California scheme the special circumstance is not just an aggravating factor: it is a fact or set of facts, found beyond reasonable doubt . . . which *changes the crime* from one punishable by imprisonment of 25 years to life *to one which must be punished either by death* or life imprisonment without possibility of parole." (*People v. Superior Court (Engert)* (1982) 31 Cal.3d 797, 803 [183 Cal.Rptr. 800, 647 P.2d 76], italics added.) Thus, it is the pleading and proof of special circumstances that make murder a crime punishable by death. Considering only the ordinary meaning of the words appearing in section 26, making duress unavailable as a defense to a "crime . . . punishable by death," this could mean either, as the majority concludes, that duress is unavailable as a defense to any form of murder, or, as I conclude, that duress is unavailable only when the crime is capital murder— that is, first degree murder with at least one special circumstance.

This ambiguity is resolved by applying two well-established rules of statutory construction. The first of these rules is used to determine whether a statutory provision mentioned in another provision is incorporated only in its

contemporary form or instead as it might later be changed from time to time. The rule is this: If the reference to the other law is specific, as to a particular code provision by section number, then the referenced provision is incorporated only as it then existed, but if instead the reference is general, " 'such as . . . to a system or body of laws or to the general law relating to the subject in hand, the referring statute takes the law or laws referred to not only in their contemporary form, but also as they may be changed from time to time . . . . [Citations.]' " (*Palmero v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 59 [195 P.2d 1]; accord, *People v. Cooper* (2002) 27 Cal.4th 38, 44 [115 Cal.Rptr.2d 219, 37 P.3d 403]; *Kirk v. Rhoads* (1873) 46 Cal. 398, 402; *Pearce v. Director, Office of Workers', etc.* (9th Cir. 1979) 603 F.2d 763, 767; 2B Singer, Sutherland Statutes and Statutory Construction (6th ed. 2000) § 51.07, p. 270.)

Section 26, making duress a defense "unless the crime be punishable with death," implicitly incorporates by reference other statutory provisions defining crimes and prescribing their punishments. Section 26's reference to other statutory provisions is general rather than specific. A specific reference would identify by name or by the Penal Code section the crimes to which duress is not a defense. By instead referring generally to "a crime not punishable with death," the Legislature expressed an intention to incorporate the general body of law relating to capital punishment as it might change from time to time.

The question remains, however, whether, as applied to the crime of murder, the phrase "crime . . . punishable with death" in section 26 means murder in all its forms or only capital murder.

This question is best answered by applying another settled rule of statutory construction, long accepted by both this court and the United States Supreme Court: "A term appearing in several places in a statutory text is generally read the same way each time it appears." (*Ratzlaf v. U.S.* (1994) 510 U.S. 135, 143 [114 S.Ct. 655, 660, 126 L.Ed.2d 615]; accord, *People v. McCart* (1982) 32 Cal.3d 338, 344 [185 Cal.Rptr. 284, 649 P.2d 926]; *Hoag v. Howard* (1880) 55 Cal. 564, 565.) Here, the Legislature adopted the original Penal Code of 1872 as a single statutory text, and references to crimes "punishable by death" appear in several places in that text. Until now, this court has consistently interpreted this phrase as excluding all noncapital forms of murder.

For example, section 1095 of the original Penal Code provided that "[i]f the indictment is for an offense punishable with death, two counsel on each side may argue the cause to the jury." This provision has since been

amended to eliminate the reference to indictment, but its substance remains unchanged. This court has construed Penal Code section 1095 as allowing two counsel to argue for the defendant only in capital cases. (*People v. Darling* (1962) 58 Cal.2d 15, 19 [22 Cal.Rptr. 484, 372 P.2d 316]; *People v. Ah Wee* (1874) 48 Cal. 236, 238.) Section 1270 of the original Penal Code provided that "[a] defendant charged with an offense punishable with death cannot be admitted to bail, when the proof of his guilt is evident or the presumption thereof great. . . ." In 1880, this court held that a defendant charged with murder was entitled to bail when the evidence showed that the offense was at most second degree murder, because second degree murder was not a capital crime. (*Ex Parte Wolff* (1880) 57 Cal. 94; see also *Ex parte Brown* (1885) 68 Cal. 176 [8 P. 829]; 4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Pretrial Proceedings, § 82, p. 281.) Section 1272 of the original Penal Code provides for bail on appeal "[a]fter conviction of an offense not punishable with death . . . ." This court has construed section 1272 as giving the court discretion to grant bail on appeal when the defendant is convicted of a noncapital offense like second degree murder. (See *In re Podesto* (1976) 15 Cal.3d 921, 929 [127 Cal.Rptr. 97, 544 P.2d 1297]; *Ex parte Brown, supra,* 68 Cal. at p. 182; *People v. Superior Court (Roam)* (1999) 69 Cal.App.4th 1220, 1230 [82 Cal.Rptr.2d 119].)

Thus, two established rules of statutory construction resolve the ambiguity in section 26 concerning the availability of duress as a defense to murder. In making duress unavailable for a "crime . . . punishable with death," the Legislature intended to bar the defense only as to those murders for which capital punishment was authorized as punishment when the murder was committed. Under current law, the category includes only first degree murders with special circumstances. This conclusion is consistent with every published decision that has in any way spoken to the issue. (See *Tapia v. Roe* (9th Cir. 1999) 189 F.3d 1052, 1057 [stating that "[a]s defined by California law, duress can excuse crimes, including murder without special circumstances . . ."]; *People v. Petro* (1936) 13 Cal.App.2d 245, 248 [56 P.2d 984] [stating that duress is unavailable "where the crime charged may be punished with death, and the evidence clearly shows that the death penalty may be imposed"]; see also *People v. Beardslee* (1991) 53 Cal.3d 68, 85 [279 Cal.Rptr. 276, 806 P.2d 1311] [quoting with apparent approval a standard jury instruction stating that duress is unavailable " '[w]here a person commits first degree murder with a special circumstance' "]; *People v. Moran* (1974) 39 Cal.App.3d 398, 416 [114 Cal.Rptr. 413] [holding evidence failed to prove duress as a matter of law, thereby implying duress can be a defense to noncapital murder]; *People v. Son* (2000) 79 Cal.App.4th 224, 232, fn. 9 [93 Cal.Rptr.2d 871], quoting *People v. Petro, supra,* at p. 248.)

## II

To resolve the ambiguity in section 26's reference to a "crime . . . punishable by death," the majority uses an entirely different reasoning process. The majority traces the history of section 26. Although section 26 was enacted in 1872 as part of the original Penal Code, the majority construes it as a continuation of an even earlier provision, enacted in 1850 as section 10 of the Act Concerning Crimes and Punishments (the 1850 Act).

The majority asserts that the 1850 Legislature intended to codify a common law exception to the defense of duress and to make duress forever unavailable as a defense to the crimes that in 1850 were punishable with death, regardless of any later changes in laws relating to capital punishment. I disagree with these assertions.

The majority is wrong in asserting that section 10 of the 1850 Act merely codified a common law exception to the defense of duress for the killing of an innocent person. The majority quotes only the last sentence of the following explanation by Blackstone: "Another species of compulsion or necessity is what our law calls duress *per minas* (by threats), or threats and menaces, which induce a fear of death or other bodily harm, and which take away for that reason the guilt of many crimes and misdemeanors, at least before the human tribunal. But then that fear, which compels a man to do an unwarrantable action, ought to be just and well-grounded; such, '*qui cadere possit in virum constantem, non timidum et meticulosum* (as might seize a courageous man not timid or fearful),' as Bracton expresses it, in the words of the civil law. Therefore, in time of war or rebellion, a man may be justified in doing many treasonable acts by compulsion of the enemy or rebels, which would admit of no excuse in time of peace. This, however, seems only, or at least principally, to hold as to positive crimes, so created by the laws of society, and which, therefore, society may excuse; but not as to natural offenses, so declared by the law of God, wherein human magistrates are only the executioners of divine punishment. And, therefore, though a man be violently assaulted, and hath no other possible means of escaping death, but by killing an innocent person, this fear and force shall not acquit him of murder; for he ought rather to die himself than escape by the murder of an innocent." (2 Jones's Blackstone (1916) p. 2197, fns. omitted.)

Thus, as Blackstone explained, under the common law duress was a defense to treason but not to murder because the former was merely a "positive crime" established by the laws of society while the latter was a "natural offense" established by the law of God. But California law has never drawn this distinction between positive and natural crimes, and the

1850 Legislature, by specifying death as the punishment for both treason and murder, made duress unavailable as a defense to either. "A code section is presumed to be a continuation of the common law only when it and the common law are *substantially* the same." (*People v. Valentine* (1946) 28 Cal.2d 121, 142 [169 P.2d 1], italics added.) Because the availability of the duress defense under the 1850 Act was not substantially the same as under the common law, there can be no presumption that section 10 of the 1850 Act is a continuation of the common law.

Nor do I agree with the majority that the 1850 Legislature intended duress to remain unavailable as a defense to all those crimes, and only those crimes, that in 1850 were punishable with death, regardless of any later changes in laws relating to capital punishment. As explained above, a general rather than specific statutory reference to other law incorporates the referenced law as it may change over time. (*Palmero v. Stockton Theatres, Inc., supra,* 32 Cal.2d at p. 59.) The language of section 10 of the 1850 Act making duress a defense to "a crime not punishable with death," like the language of current section 26 making duress a defense "unless the crime be punishable with death," is a general rather than a specific reference to other laws concerning capital punishment. Had the 1850 Legislature wanted to exclude the effects of later changes in the scope of capital punishment, it need only have referred by name to the three crimes that the 1850 Act made punishable by death—murder, treason, and perjury procuring an innocent person's execution—or to the sections of the 1850 Act defining those crimes.

Attempting to cast doubt on this conclusion, the majority asserts that section 26's reference to a "crime . . . punishable with death" may be considered a specific reference because it is "far narrower" than the reference found to be specific in *Palermo v. Stockton Theatres, Inc., supra,* 32 Cal.2d 53. (Maj. opn., *ante,* at p. 779.) At issue there was a provision of the California Alien Land Act (Stats. 1921, p. lxxxiii) as amended in 1923 (Stats. 1923, p. 1021), under which a corporation owned by Japanese nationals could lease land " 'to the extent and for the purposes prescribed by any treaty now existing between the . . . United States' and Japan." (*Palermo v. Stockton Theatres, Inc, supra,* at p. 55.) This court said that the question whether this reference to "any treaty now existing" is general or specific "might, as an abstract proposition, admit of different opinions" (*id.* at p. 59), but that this court was "constrained to hold that reference is specific" because there was "grave doubt whether our Legislature could constitutionally delegate to the treaty-making authority of the United States the right and power thus directly to control our local legislation with respect to future acts" (*id.* at p. 60).

Section 26's reference to a "crime . . . punishable by death" is in no way similar to the Alien Land Act's reference to "any treaty now existing"

between the United States and Japan. Most obviously, section 26 does not refer to a crime *now* punishable with death, but simply to a crime punishable by death. The word "now" is a strong indication that the Legislature, when it adopted and amended the Alien Land Act, was referring to treaties then in existence and not to treaties that might later come into force. In addition, the reference to a "treaty" is a reference to a specific legislative act rather to a general body of law. By comparison, section 26 does not refer to a "statute" or "section" or "law" prescribing the penalty of death but instead, more generally and simply, to a "crime . . . punishable with death." Finally, recognizing that section 26's reference is general rather than specific does not raise any grave doubts about its validity. Thus, upon examination, this court's decision in *Palermo v. Stockton Theatres, Inc., supra,* 32 Cal.2d 53, provides no support for the majority.

The majority makes no effort to compare section 26's reference language with other reference language that the courts of this state have found to be general rather than specific. For example, in 1873 this court concluded that a reference in a city's act of incorporation to "all the provisions of law in force regulating elections" was a general reference incorporating state election law as it might change over time. (*Kirk v. Rhoads, supra,* 46 Cal. 398, 402-403.) More recently, this court concluded that the reference in Welfare and Institutions Code section 726 to the "maximum term of imprisonment" for an offense was a general reference to the determinate sentencing law. (*In re Jovan B.* (1993) 6 Cal.4th 801, 816 [25 Cal.Rptr.2d 428, 863 P.2d 673].) And the Court of Appeal, in an opinion authored by Justice Chin, concluded that the reference in Welfare and Institutions Code section 3201, subdivision (c), to the "good behavior and participation credit provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code" was a general reference to a system or body of laws. (*People v. Eddy* (1995) 32 Cal.App.4th 1098, 1106 [38 Cal.Rptr.2d 563].) Finally, this court has construed references to crimes "punishable with death" in other provisions of the Penal Code as referring to the capital punishment laws in effect when the crime was committed, not when the provision was first enacted. (*People v. Darling, supra,* 58 Cal.2d at p. 19; *Ex Parte Wolff, supra,* 57 Cal. 94; *In re Podesto, supra,* 15 Cal.3d at p. 929.) Examination of these other decisions further confirms that section 26's reference to a "crime . . . punishable with death" is general rather than specific.

The majority broadly asserts that the 1850 Legislature must have intended to exclude the effects of later changes in capital punishment law because there is no reason why the Legislature would have wanted the availability of the duress defense to vary over time as the Legislature expanded or contracted the category of crimes punishable with death.

The majority's assertion is belied by the very words of the provision this court is construing. In 1850, when it enacted the 1850 Act, and again in 1872, when it enacted the original Penal Code, the Legislature declared duress to be a defense to all crimes except those "punishable with death." This language reflects the Legislature's decision to link the availability of the duress defense with the laws prescribing death as a punishment for crime.

The Legislature's decisions whether to allow a duress defense and whether to authorize the death penalty both reflect societal judgments about the seriousness of the offense in question. In the first instance, the societal judgment is whether an offense is so serious that an individual is expected to forfeit his or her life rather than commit it. In the second instance, the societal judgment is whether an offense is so serious that a person who has committed it should forfeit his or her life. The Legislature could reasonably have concluded that the same small category of highly serious offenses that warranted capital punishment could not be excused by a claim of duress. Also, if duress is not a defense to a noncapital crime, then the law has created a situation in which one is better off breaking the law than obeying it because by committing the crime one risks only a prison sentence, while by refusing to commit the crime one risks death or very serious injury from the person imposing the duress. The Legislature may well have concluded that a just system of laws does not place those who obey the law in a worse position than those who break it.

The majority acknowledges that under an established rule of statutory construction a term appearing in several places in a statutory text should be given the same meaning throughout. (See *Ratzlaf v. U.S., supra,* 510 U.S. at p. 143 [114 S.Ct. at p. 660].) But the majority offers two reasons for not applying the rule here: because section 26 refers to a "crime" that is "punishable with death" whereas other provisions of the Penal Code refer to an "offense" that is so punishable, and because the other provisions define the scope of procedural rights rather than substantive defenses. Neither of these suggested reasons is persuasive.

It makes no difference that the other provisions refer to "offenses" punishable with death rather than to "crimes" punishable with death. This court has stated that " 'the word "offense" and the word "crime" hav[e] the same legal significance.' " (*Doble v. Superior Court* (1925) 197 Cal. 556, 571 [241 P. 852]; see also Pen. Code, § 15 [giving a single definition for the words *crime* and *public offense*].) The rule of statutory construction that phrases repeated in a statute are presumed to have the same meaning throughout applies not only when the words are identical but also when the words are

equivalent. (*Cohen v. De la Cruz* (1998) 523 U.S. 213, 220 [118 S.Ct. 1212, 1217, 140 L.Ed.2d 341].)

Nor is there any support for the majority's distinction between procedural and substantive purposes of the references in different provisions of the Penal Code to a crime "punishable by death." The majority bases that distinction on its assumption that although it is reasonable and logical to distinguish capital and noncapital forms of murder for purposes of procedural rights, it is not logical and reasonable to distinguish capital and noncapital forms of murder for purposes of defining when the defense of duress is available and when it is not available. As I have explained, there is nothing unreasonable or illogical about linking the availability of the duress defense to the seriousness of the charge as reflected in the laws governing capital punishment.

## III

The majority appears to argue that this court *must* construe section 26 as not permitting the defense of duress to any form of murder because sound considerations of public policy require that no amount of threats or menaces can justify the taking of innocent human life. In my view, such public policy considerations have a very limited role to play in the process of statutory construction. In general, this court may not substitute its public policy views for those of the Legislature under the guise of statutory construction. When the language of a statute is ambiguous, however, this court may prefer a resolution of the ambiguity that avoids absurd consequences or that no reasonable legislative body could have intended. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 328 [96 Cal.Rptr.2d 735, 1 P.3d 52].)

Here, a construction of section 26 that makes the defense of duress unavailable as to capital murder but available as to noncapital murder does not produce results that are absurd or that no reasonable legislative body could have intended. On the contrary, the question of the proper boundaries or limits on the defense of duress is one on which reasonable minds can differ and have differed, and the construction of section 26 that I have arrived at by applying well-established rules of statutory construction represents a moderate approach in line with mainstream legal thinking.

For example, the Model Penal Code allows the defense of duress to be asserted against *all* criminal charges, including murder. (Model Pen. Code, § 2.09.) Under the Model Penal Code's formulation of the defense, duress is a defense whenever "a person of reasonable firmness in [the defendant's] situation would have been unable to resist." (*Id.,* § 209, subd. (1).) In the

official comment to this provision, the American Law Institute explains that "persons of reasonable firmness surely break at different points depending on the stakes that are involved"; it further observes "that even homicide may sometimes be the product of coercion that is truly irresistible, that danger to a loved one may have greater impact on a person of reasonable firmness than a danger to himself, and, finally, that long and wasting pressure may break down resistance more effectively than a threat of immediate destruction." (Model Pen. Code & Commentaries, com. 3 to § 209, p. 376.)

The states of Connecticut, New York, North Dakota, Tennessee, Texas, and Utah have adopted statutes similar to the Model Penal Code allowing duress as a defense to homicide. (See Rutkowski, *A Coercion Defense for the Street Gang Criminal: Plugging the Moral Gap in Existing Law* (1996) 10 Notre Dame J.L. Ethics and Pub. Pol'y 137, 205, fn. 332.) Also, the laws of most civil law countries—including Belgium, Greece, the Netherlands, Germany, Switzerland and Sweden—recognize duress as a defense to any crime, including murder. (Swaak-Goldman, *International Decision: Prosecutor v. Erdemovic, Judgement* (1998) 92 Am. J. Internat. L. 282, 284, fn. 14.)

As a leading commentator on the law of duress has stated, "[d]uress always is a matter of line drawing about which reasonable minds can differ" (Dressler, *Exegesis of the Law of Duress: Justifying the Excuse and Searching for Its Proper Limits* (1989) 62 So.Cal. L.Rev. 1331, 1367). Indeed, the weight of scholarly commentary favors the Model Penal Code's definition of duress and its abolition of the common law murder exception to the duress defense. (See Alexander, *A Unified Excuse of Preemptive Self Protection* (1999) 74 Notre Dame L.Rev. 1475, 1488; Dienstag, *Federenko v. United States: War Crimes, the Defense of Duress, and American Nationality Law* (1982) 82 Colum. L.Rev. 120, 142, fn. 72; Finkelstein, *On the Obligation of the State to Extend a Right of Self-defense to Its Citizens* (1999) 147 U.Pa. L.Rev. 1361, 1382, fn. 53; Finkelstein, *Duress: A Philosophical Account of the Defense in Law* (1995) 37 Ariz. L.Rev. 251, 256 ["the requirement that duress not be pleaded as a defense to murder makes little sense under either of the prevalent rationales for the defense"]; Hill, *Moralized Theories of Coercion: A Critical Analysis* (1997) 74 Denv. U. L.Rev. 907, 912, fn. 24; Newman & Weitzer, *Duress, Free Will and the Criminal Law* (1957) 30 So.Cal. L.Rev. 313, 334 ["[t]he defense of duress should be open to all persons regardless of the nature of the crime charge"]; O'Regan, *Duress and Murder* (1972) 35 Mod. L.Rev. 596, 603-604; Reed, *Duress and Provocation as Excuses to Murder: Salutary Lessons from Recent Anglo-American Jurisprudence* (1996) 6 J. Transnat'l L. and Pol'y 51, 59; Yee, *Prosecutor v. Erdemovic Judgment: A Questionable Milestone for the International Criminal Tribunal for the Former Yugoslavia, Appeals of Chamber October 7, 1997* (1997) 26 Ga. J. Int'l & Comp. L. 263, 296-297.)

I do not here suggest that the Legislature should adopt the Model Penal Code approach, under which duress is available as a defense to any crime, including capital murder. I suggest only that a construction of section 26 under which duress is a defense to noncapital murder, but not to capital murder, represents a moderate, middle-of-the road approach that a legislative body plausibly could have adopted to resolve a difficult and complex issue on which reasonable minds may differ.

The majority's discussion appears to assume that murder necessarily involves a *choice* to take an innocent life. Second degree murder, however, does not require an intent to kill. A person who engages in a provocative act (see *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107-108 [13 Cal.Rptr.2d 864, 840 P.2d 969]) or who drives with great recklessness (see *People v. Watson* (1981) 30 Cal.3d 290, 297-299 [179 Cal.Rptr. 43, 637 P.2d 279]) may be convicted of second degree murder under an implied malice theory. Yet, under the majority's construction, section 26 does not allow a duress defense even in situations of unintentional implied malice killings.

Imagine, for example, this scenario: Two armed robbers fleeing the scene of a store robbery force their way into a car that is leaving the parking lot. One robber holds a gun to the driver's head, while the other places a gun against the head of the driver's wife. They order the driver to take off at high speed and not to stop or slow down for stop signs or signal lights, threatening immediate death to the driver and his wife. If the driver complies, and an accident ensues resulting in the death of an innocent person, the driver could be prosecuted for second degree murder on an implied malice theory, and, under the majority's construction of section 26, the driver could not assert duress as a defense. I doubt that our Legislature intended to withhold the defense of duress under these or similar circumstances.

The majority expresses concern that if defendants can assert a duress defense to noncapital murder, the defense may be used to excuse killings by gang members. But most if not all gang-motivated killings are capital murder because it is a special circumstance that "the defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang." (Pen. Code, § 190.2, subd. (a)(22).) Moreover, the defense of duress is not available to a defendant who recklessly or intentionally placed himself in a situation where coercion to commit criminal acts could reasonably be anticipated. Because persons who join criminal street gangs or terrorist organizations can anticipate pressure to commit crimes, the defense would usually be unavailable to those individuals. (See *State v. Scott* (1992) 250 Kan. 350 [827 P.2d 733, 739-740] [defendant who voluntarily

joined drug-selling organization barred from asserting duress when coerced into torturing fellow gang member]; Rutkowski, *A Coercion Defense for the Street Gang Criminal: Plugging the Moral Gap in Existing Law, supra,* 10 Notre Dame J.L. Ethics & Pub. Pol'y at p. 186, fn. 239 ["Most jurisdictions hold that intentionally placing oneself in the position where one would likely be the subject of coercion will defeat a duress defense."].)

## IV

Because, as I have concluded, duress is a defense to noncapital murder, a defendant charged with noncapital murder is entitled to a jury instruction on the defense if there is substantial evidence to support it. This means " 'evidence from which a jury composed of reasonable [people] could have concluded that there was [duress] sufficient to negate the requisite criminal intent.' " (*People v. Flannel* (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr. 84, 603 P.2d 1], quoting *People v. Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513].) Under section 26, the defense of duress is only available to defendants who present evidence of threats or menace sufficient to show a reasonable and actual belief that their life was presently and immediately endangered if participation was refused. (*People v. Perez* (1973) 9 Cal.3d 651, 657 [108 Cal.Rptr. 474, 510 P.2d 1026]; *People v. Quinlan* (1970) 8 Cal.App.3d 1063, 1068 [88 Cal.Rptr. 125].)

Here, defendant failed to present substantial evidence of duress. He testified that Ron Kiern told him, "Give me the rock or I'll beat the shit out of you" and that he complied because he feared that Kiern, a stronger and bigger man, would beat him severely. Yet, Kiern did not threaten him with death, and there was no history of violence between the two men despite their long acquaintance. In addition, defendant voluntarily joined Kiern in the initial attack on the victim, thereby placing himself in the situation where he should have anticipated that Kiern would pressure him to commit further acts of violence. Throughout the day, defendant made no use of opportunities to leave Kiern and to obtain help for the victim.

Because defendant presented insufficient evidence of duress to warrant a jury instruction on that defense, I agree with the majority that the Court of Appeal properly affirmed defendant's conviction.

## CONCLUSION

Under California law, duress is a defense to any criminal charge "unless the crime be punishable with death." (§ 26.) According to the majority, this means that duress is never a defense to murder, even though California law

restricts the death penalty to first degree murders with special circumstances. The majority reaches its result largely by applying a maxim—no amount of duress excuses the taking of innocent human life—that it treats as an infallible solution to a profound moral quandary. I cannot agree, not only because the majority's maxim is not a fair reading of the far different statutory language, but also because the majority oversimplifies a highly complex issue. I would adopt a statutory construction more consistent with the ordinary meaning of the statutory text, barring the defense of duress only as to capital murder and other capital crimes, and leaving to the jury in all other situations the question whether duress excuses an otherwise criminal act.

Appellant's petition for a rehearing ws denied October 2, 2002.