Filed 11/13/15  P. v. Lopez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B256352 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA355993) |
| v. | |
| ROCKY A. LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Ronald S. Coen, Judge.  Affirmed.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

After the first trial in 2013 ended in a mistrial following the jury's inability to reach a verdict, defendant and appellant Rocky A. Lopez was retried. The second jury found defendant guilty of the attempted first degree murder of Juan Amaya. The jury also found true the special allegations that the attempted murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, and that a principal personally used and discharged a firearm in the commission of the offense causing great bodily injury to the victim.

Defendant raises multiple claims of error: (1) there is no substantial evidence supporting the "primary activities" prong of Penal Code section 186.22, subdivision (f); (2) the court erred in admitting prior uncharged crime evidence without an appropriate instruction on the relevant burden of proof; (3) the jury's finding of premeditation is without merit as to defendant because he was not the direct perpetrator, there was no evidence he personally premeditated the crime, and no instruction requiring the jury to so find; (4) the modified duress instruction denied defendant a crucial defense and was unduly prejudicial; (5) the court failed to sua sponte instruct on the defense of necessity; (6) the prosecutor committed misconduct during closing argument by misstating the law regarding premeditation, and defense counsel was ineffective for failing to object; and (7) cumulative error.

Finding no merit in any of these arguments, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 27, 2010, defendant was charged by information with one count of attempted premeditated murder (Pen. Code, § 187, § 664, subd. (a)). It was specially alleged the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22. It was also specially alleged that a principle personally used and discharged a firearm during the commission of the offense causing great bodily injury to the victim (§ 12022.53, subds. (b)-(e)). Defendant pled not guilty and denied the special allegations.

2

The charges arose from a shooting that occurred on April 29, 2009 in the city of Los Angeles. The evidence at trial, viewed in the light most favorable to the judgment, revealed the following.[1]

Around 4:00 p.m. on April 29, 2009, J.A. was talking to his cousin, M.P., outside her apartment on Westmoreland Avenue in Los Angeles. Another cousin, M.R., was also with them part of the time. As they were talking, M.P. saw a light-colored truck "going fast," then pull to a stop at the corner of Westmoreland and San Marino. Two Hispanic males got out of the truck and started walking in their direction. M.R. testified she was not sure if they got out of a white truck or had come from behind a fence at the end of the street. After the two males got out, the truck drove off.

The two males, who appeared to be in their mid-20's, were both wearing black sweatshirts with the hoods pulled up or some type of "hoodie." They walked up to J.A. and asked where he was from. J.A. said "El Salvador." They asked him what gang he belonged to, and he said "none."[2] One of the males, standing only about three to six feet from J.A., responded "mierda seca" ("dry shit"), and then pulled a handgun from his sweatshirt. He fired his gun about six times and said "mierda seca" again. J.A. was shot multiple times in the stomach, leg and buttocks (the wounds required multiple surgeries and left J.A. with permanent disabilities). The two Hispanic males then walked away at a "fast pace" toward the intersection with Olympic Boulevard.

F.R. was waiting in his van at the signal on Olympic Boulevard when he heard several gunshots. He turned to look in the direction of the gunshots and saw two Hispanic males running toward Olympic. One had a gun in his hand and he looked to be trying to hide it in his sweatshirt by holding it close to his body as he ran. A white

---

[1]     We have summarized only those facts and procedural issues material to our discussion of the appellate issues raised, including the one substantial evidence question related solely to the gang enhancement.

[2]     Both J.A. and M.P. testified J.A. did not have any tattoos and did not belong to any gang. J.A. believed the shooter may have mistaken him for his cousin, A.A., who was in a gang.

truck was parked on Olympic. F.R. saw the driver of the truck and testified it was defendant he saw that day in the driver's seat. He saw defendant motion with his hand to the two males, and they ran to the truck and got in. The truck then drove off quickly. F.R. drove down Westmoreland Avenue and tried to help J.A. until the paramedics arrived.

K.H., an attorney with the Los Angeles District Attorney's Office, was also driving along Olympic Boulevard that afternoon. At that time of day, parking is prohibited on Olympic, so it was noticeable to her that a white, extended cab truck was essentially parked, or "slowly creeping" forward, along the curb. Almost immediately she saw two Hispanic males wearing baggy clothes, running very fast toward the truck. It appeared to be "waiting for them." The two males jumped in on the passenger side, and the truck immediately pulled in to traffic. K.H. saw the driver's face as he turned his head to pull away from the curb. K.H. was directly behind the truck, so she wrote the license plate number on her hand and followed it. After a short distance, the truck quickly pulled across several lanes of traffic and made a left turn onto a cross street. K.H. called the police, told them what she had seen, and gave them the license plate number. K.H. identified defendant in court as the driver, and confirmed the six-pack photographic lineup in which she had previously identified defendant as the driver.

Sergeant Pedro Llanes of the Los Angeles Police Department (LAPD) responded to the scene of the shooting. He directed other responding officers to secure the scene and waited with J.A. until he was transported by paramedics to the hospital. Detective John Skaggs also arrived on scene to assist in processing the evidence. Several expended casings from a nine-millimeter semi-automatic handgun were recovered.

George Diego, an officer with the gang detail of the LAPD's southwest division, was on patrol with his partner. One of the primary gangs in the southwest division is known as Harpy's, and Officer Diego was familiar with them. Officer Diego and his partner heard the dispatch call of the shooting, along with the description and license plate number of the suspects' truck that had been reported by K.H. They ran the license

4

plate number which came back to a registered owner and address on West 31st Street, just a few blocks from where they were patrolling.

Officer Diego and his partner drove to the address on West 31st Street and saw a white Dodge Ram parked in front of a residence. Several people, including defendant, were standing in the front yard. Officer Diego and his partner called for backup and then got out to go up to the house. As he walked by the truck, Officer Diego touched the hood and it felt warm, as if recently driven.

The home was searched, as were the additional detached living areas at the back of the property. Defendant's parents lived in the main house. Defendant, his wife and children lived in one of the detached units, and defendant's brother Ulysses lived in the other unit. Another structure on the property was used as a recording studio. Various items were recovered during the search of the property, including several items containing graffiti referencing the Harpy's gang, a photograph of defendant wearing a tuxedo and flashing the Harpy's "H" hand sign, two guns and a box of ammunition.

Brian Calicchia, a detective with the LAPD's Criminal Gang Homicide Division, testified that he used to work the gang detail in the LAPD's southwest division. Working the gang detail involved building rapport with gang members through consensual encounters, in order to gather information about gang activities, and to attempt to deter or suppress that activity. Detective Calicchia estimated he had approximately 500 encounters with Harpy's gang members. He estimated he had investigated close to 1,000 violent crimes involving gang members during the course of his career.

Detective Calicchia identified defendant in court as a Harpy's gang member with the moniker "Scrappy." He specifically recalled a consensual encounter with defendant in 2006 in which he filled out a Field Identification Card (FIC). FIC's are maintained as official records by the LAPD. Defendant admitted to Detective Calicchia that he was a Harpy's gang member, and specifically part of the gang's 5th Avenue clique. Defendant did not tell Detective Calicchia that he only belonged to a skateboarding or tagging crew. Additional information documented on the FIC was defendant's moniker, that he had a tattoo on his chest of "5th," that at the time of the stop he was in territory claimed by the

5

Harpy's gang, and that he was in the company of two other self-admitted Harpy's gang members (his brother Ulysses, and Louie Baez). Detective Calicchia said defendant's father was also a documented member of the Harpy's gang.

The prosecution presented Officer Rene Gonzalez as its gang expert. Officer Gonzalez testified to his training and experience with gangs, including working on a joint LAPD/FBI gang task force, a joint LAPD/DEA task force on regional gangs and the Mexican Mafia, and working gang details in numerous divisions of the LAPD. Officer Gonzalez was personally familiar with the Harpy's gang and had testified over 20 times as an expert on Harpy's. Officer Gonzalez echoed much of the testimony of the other gang officers concerning the police work performed in a gang detail, including the cultivation of regular consensual contact with gang members to build rapport and gather information on gang activities, gang structure and habits. Officer Gonzalez estimated he had investigated at least 1,000 violent crimes involving gang members.

Officer Gonzalez explained that gangs ordinarily identify with a hand sign, appropriate insignia from sports teams that reflect their gang name and colors, and that individual members are typically known by nicknames or monikers and have tattoos referencing the gang name and symbols. Individuals seeking to become a part of an established gang will commit crimes for the gang which is called "putting in work." Putting in work often includes assisting with a crime, but not being the direct perpetrator, and demonstrates the individual's commitment to the gang. Gangs also exert control over a particular territory with graffiti, and by engaging in crime in broad daylight to instill fear in the community. Officer Gonzalez explained that non-gang members do not ordinarily have gang-related tattoos or display gang symbols because that would subject the person to "severe repercussions" for appropriating a gang symbol without being a member. He explained it is not uncommon for some gang members to have families, hold regular jobs or go to school.

Officer Gonzalez has been "a primary investigator" of the Harpy's gang since 2006. The gang is predominantly Hispanic and, at the time of trial, had approximately 250 documented members. The name Harpy's derives from the name for a South

6

American eagle. The gang started as a car club in the 1960's. The hand sign used by the gang is an "H" formed primarily with the index fingers and thumbs. Officer Gonzalez was not aware of any documented skateboarding or tagging crews that used that hand symbol. The prosecution showed him various photographs depicting numerous Harpy's gang members and/or their respective tattoos and Officer Gonzalez confirmed their identity based on his personal knowledge of the gang. He was familiar with them from his "gang files" and records maintained by LAPD. One of the photographs showed defendant's tattoo across his chest, and another showed defendant's brother Ulysses wearing a Philadelphia Eagles jersey with the number 5, which Officer Gonzalez explained reflected the 5th Avenue clique and the South American eagle for which Harpy's is named.

Officer Gonzalez was familiar with defendant (also known as Scrappy), his brother Ulysses (also known as Lazy Gangster), and his father as members of Harpy's. He believed the first documented identification of defendant as a member was in 2006 as reflected in the FIC prepared by Detective Calicchia, and that the Lopez family home on West 31st Street was on the border between territory claimed by Harpy's and territory claimed by the Harlem Crips gang. Defendant's father's business office was known by LAPD gang officers as a Harpy's "hangout."

Officer Gonzalez opined that Harpy's "actively commits crimes." When asked what the primary criminal activities of the gang were, Officer Gonzalez responded that in and around the time J.A. was shot in 2009, he "arrested numerous members of the Harpy's gang for multiple crimes, such as gun possession, grand theft auto, narcotics sales, murder, attempt[ed] murders, [and] extortion." The prosecution asked Officer Gonzalez if all of those crimes were committed regularly and he responded "not regularly."

Based on his review of court records admitted into evidence at trial, Officer Gonzalez confirmed that an admitted Harpy's gang member was arrested in October 2007 and convicted in 2008 of robbery. He was the arresting and investigating officer. He was also the arresting officer in the arrest of another admitted Harpy's gang member for

7

murder in February 2008. When asked a hypothetical by the prosecution based on the facts of the charged offense, Officer Gonzalez opined that such a shooting, in rival gang territory, in broad daylight, would be properly characterized as gang related.

Officer Gonzalez testified that the location on Westmoreland Avenue where J.A. was shot is not in Harpy's territory. Rather, it was in the territory of a Salvadoran gang known as Mara Salvatrucha or "MS." MS is one of Harpy's longtime rivals.[3] About two weeks before the shooting of J.A., a similar shooting occurred on Bronson Avenue which also is in territory claimed by MS.

LAPD Officer Karen Montoya testified about the shooting incident that occurred on Bronson Avenue on or about April 17, 2009. She and her partner responded to the scene and recovered several expended shell casings from a nine-millimeter handgun, as well as several casings from a 38-caliber handgun. One of the victims, E.F., reported to Officer Montoya that he and his friends, J.M. and M.L., had been standing around talking, when a Honda Accord and a white truck drove down the street, turned around and then pulled to a stop. Several Hispanic males got out of both vehicles and started running toward them, shooting at them. E.F. and his friends ran off and were not injured. E.F. admitted he told Officer Montoya that one of the suspect vehicles was a white truck, but at the time of trial he had some difficultly recalling the color of the truck because of the amount of time that had passed.[4]

---

[3]  LAPD Detectives Humberto Tovar and Luis Corona explained that the phrase "mierda seca" said to the victim when he was shot is a derogatory term used by rival gang members for members of the MS gang.

[4]  J.M. testified he saw the truck and Honda drive by and make a U-turn before stopping. He also had difficulty recalling the color of the truck because it had been dark, he and his friends immediately tried to run away, and it had been several years since the incident. The truck could have been light, but also may have been a dark color. M.L. testified he saw a white Dodge pickup truck, but he believed the rims on the tires were different than those in the picture of defendant's truck that was shown to him by LAPD officers.

8

Evidence was received demonstrating that a gun recovered from a non-Harpy's gang member at another crime scene several months after the incident matched the nine-millimeter casings recovered from the scene of the April 17, 2009 incident, and at the scene of the April 29, 2009 shooting of J.A.

Defendant testified in his own defense. He said he was not, and had never been, a member of the Harpy's gang. He conceded his father had been and was murdered in 2010. Defendant admitted talking with Detective Calicchia in 2006 as reflected in the FIC, but denied telling him that he was a gang member.

Defendant explained that when he was a teenager his father had a Harpy's gang member, Felix Quiñonez, talk to him about his tattoo of the number 5 on his chest and "throwing" the Harpy's "H" hand sign. Mr. Quiñonez told him those things could get him into trouble with the 5th Avenue clique of Harpy's. Defendant explained that he and some of his friends were not gang members but had formed a skateboarding crew. They called themselves the 5th Avenue Crew because they mostly hung out at his friend Rafael's house, and Rafael lived on 5th Avenue and Jefferson. They skated at the nearby park on Jefferson. Defendant said his tattoo of a 5 (not "5th") was for the skateboarding crew and not Harpy's. Defendant said the picture of him in a white tuxedo showing the "H" hand sign was taken on the night of his high school prom and he was throwing the sign for his family's Hard Times recording studio, not Harpy's.

Defendant said he worked and also went to school full time. He had a 4.0 grade point average for several semesters. He was trying to become a construction manager so he could provide for his wife and two children.

Defendant said that on April 17, 2009, he was at a birthday party for his wife's aunt and was there the whole night. His children also went with them to the party and he had two car seats in the back seat of his truck which makes it almost impossible for an

9

adult to sit back there.  Defendant believed the car seats for his children were also in his truck on April 29, 2009.[5]

Defendant explained that on the afternoon of April 29, 2009, he was on Westmoreland Avenue around 4:00 because he had driven to the home of his mechanic, F.D., who lived on Westmoreland.  Defendant said the "check engine" warning light was on in his truck.  F.D. looked under the hood of the truck briefly and then said they should take it for a test drive.  F.D. got into the passenger seat of defendant's truck and they drove around the block, along Olympic Boulevard and nearby streets.  The traffic was pretty heavy on Olympic so they went back to F.D. home.  F.D. told defendant what he thought the problem was and that he could fix the truck the following Saturday.  Defendant then left, driving down Westmoreland toward Olympic.

The traffic was still heavy on Olympic Boulevard.  While he was waiting at the corner to make a right turn, he noticed two Hispanic males running toward his truck.  He recognized one of them as Shaggy, a member of the 18th Street gang.  Defendant had "befriended" Shaggy because he was scared of him and he would see him often near one of the businesses at which he made deliveries for his father's tax business.  Defendant said he tried to be friendly with Shaggy because he usually had to carry money when he helped his father and he did not want to have problems when he was in Shaggy's territory.

Shaggy saw defendant and made a hand gesture to him as he continued running toward the truck.  Shaggy and the other male jumped into the truck.  Shaggy told him "Drive fool, drive fool."  Defendant was scared so he accelerated into traffic.  He asked what was wrong and they said they were being chased and told him to just keep driving.  After a few blocks, Shaggy ordered him to pull over.  When defendant stopped the truck, Shaggy and the other male jumped out.  Before slamming the door, the other male told him "you didn't see shit, remember?"

---

[5]     Defendant later testified the car seats were not in his car on April 29, and that he had been confused when he said so.

Defendant said he acquiesced to Shaggy flagging him down and giving him a ride because if he had not done so, he "would have been hurt" the next time he saw Shaggy. Defendant said he would have been killed, or beaten up, or something similar. Defendant was afraid of Shaggy because he was a "hardcore" gang member with a large 18 tattooed on his face, broadcasting his gang membership. Defendant did not believe he could tell Shaggy and his friend to get out of the truck. However, defendant conceded he did not see Shaggy or the other male with any weapon that day and neither of them made any specific threat to him or his family.

Defendant explained that the first time the police interviewed him about what happened, he did not tell them about the encounter with Shaggy because he was afraid to be a witness against him. Defendant also did not tell the police he had gone to see his mechanic that day. Defendant conceded that he instead told them he had not driven his truck at all that day because he was having problems with it.

Defendant sought advice from a lawyer. Several months later he agreed to speak with the police again and explain what really happened on April 29, 2009. During that second interview, he told the police about visiting his mechanic on Westmoreland Avenue and his run-in with Shaggy. Defendant admitted he was unable to identify the Shaggy he knew from the 18th Street gang from any of the six-pack photographic lineups the police showed him during that interview.

Defendant's wife, I.L., testified she had known defendant for over 20 years. They had been married for seven years and had two young children. She explained that defendant received the white Dodge Ram pickup truck as a high school graduation present from his parents. I.L. conceded defendant's father used to be a member of the Harpy's gang, but said defendant was not a member. She said defendant got his tattoo as a teenager because of his skateboarding crew.

I.L. explained there was a recording studio on the property where they lived. Defendant's father would rent the studio out, and sometimes defendant's brother Ulysses would use it to record Chicano rap music. They called the studio Hard Times Records. Defendant worked construction and sometimes helped his father with his tax business.

11

I.L. said defendant was with her on April 17, 2009 at a birthday party for her aunt. Her aunt, S.E., also testified that I.L., defendant, and their children were at her party from around 5:00 p.m. until about 10:00 or 11:00 p.m. She identified photographs of them taken at the party.

F.D. testified he was a mechanic who regularly worked on the Lopez family's cars. He said that on April 29, 2009, defendant brought his truck over for him to look at because the "check engine" warning light was on. F.D. said he lived on Westmoreland Avenue and defendant arrived sometime between 3:00 and 4:00 p.m. After he arrived, they drove around the block in defendant's truck so F.D. could assess what might be wrong with it. F.D. said the traffic was quite heavy so they went back to his home and defendant dropped him off. F.D. did not recall hearing any gunshots that afternoon, or seeing any ambulances or police on his street. He understood defendant's father had been in gangs but was not aware of whether defendant was in a gang.

Daniel Laughlin testified as defendant's gang expert. He attested to his experience for almost two decades working with juvenile offenders and gang members, and confirmed he was listed as a gang expert on the Los Angeles Superior Court panel of experts. He explained that, after interviewing a number of current and former gang members and individuals who knew defendant, and based on his experience, he formed the opinion that defendant was not a member of Harpy's. Mr. Laughlin said in particular that it would be highly unusual for an active gang member to have defendant's record of school attendance, good grades, work history, and successful long-term marriage with children. Mr. Laughlin also noted defendant did not have gang tattoos or a criminal record of gang activity.

Mr. Quiñonez testified he knew defendant's father from when they were in Harpy's together and that he had known defendant since he was a small child. Mr. Quiñonez explained he was "jumped in" to Harpy's at the age of 12 and was actively involved with the gang until 2009 when he left at the age of 32. As a member of Harpy's, he committed many crimes from theft "up to attempted murder" and spent time in prison. He was involved in crimes on behalf of Harpy's even while in prison, because

12

gang members on the "inside" can get things "taken care of in the street." Mr. Quiñonez testified that since leaving the gang he obtained a degree, and he now works as a counselor at San Francisco State University.

Mr. Quiñonez explained that when defendant was just a teenager, his father asked him to talk to defendant about staying away from gang activity. Defendant had gotten a tattoo of the number 5 on his chest because he was part of a skateboarding and tagging crew. Defendant's father was concerned it could get defendant into trouble with the 5th Avenue clique of Harpy's. Mr. Quiñonez explained to defendant to be careful and to not throw the Harpy's "H" hand sign to reference the family's Hard Times recording studio. In his opinion, defendant was never a member of the Harpy's gang.

On cross-examination, Mr. Quiñonez admitted that as a young gang member, he committed many crimes like stealing purses, selling drugs, and selling "pirate[d]" items like CD's which is what new members typically do. He then moved on to stealing cars and similar crimes and was eventually incarcerated for the attempted murder of a rival Crips gang member. He said members of Harpy's committed crimes for the benefit of the gang, and part of any money obtained from such activities went to the gang. Crimes committed with handguns were usually committed by more senior members. Mr. Quiñonez said he believed the "primary activities" of the Harpy's gang were "every crime that's thinkable" and included robbery, stealing cars, attempted murder and murder.

Mr. Quiñonez explained that it is "common" for gang members to commit violent crimes against rival gang members, and that after a crime is committed with a handgun it is considered a "burnt weapon" and it will often be sold cheaply to other rival gangs. He confirmed "mierda seca" was a derogatory phrase referring to rival MS gang members. He said gang members often had jobs and children, but most were not married while active in the gang.

Testimony was received from a neighbor of the Lopez family and one of the members of defendant's skateboarding crew that defendant had never engaged in any behavior consistent with being in a gang.

13

The jury found defendant guilty of attempted murder. They found true the allegations that the attempted murder was committed willfully, deliberately and with premeditation, that it was committed for the benefit of, at the direction of, or in association with a criminal street gang, and that a principal personally used and discharged a firearm causing great bodily injury to the victim.

The court sentenced defendant on the attempted murder count to life with the possibility of parole. The court also imposed a consecutive 25-to-life term for the firearm allegation pursuant to Penal Code section 12022.53, subdivisions (d) and (e). The court imposed and stayed sentences on the remaining enhancements pursuant to Penal Code, section 654.

This appeal followed.

## DISCUSSION

**1.     The Gang Enhancement Evidence**

Defendant contends the prosecution failed to present substantial evidence of the "primary activities" of the Harpy's gang within the meaning of Penal Code section 186.22. We disagree.

The statutory definition of "criminal street gang" is "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (f).)

Evidence of both past offenses by the gang's members, as well as the current charges are relevant and admissible to establish the gang's primary activities within the meaning of the statute. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the

14

group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Ibid.*)

Our Supreme Court has explained that "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in [*People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*)]. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See [Pen. Code,] § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies. (*Gardeley*, *supra*, at p. 620.)" (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324.)

Here, the prosecution presented expert testimony on Harpy's activities through Officer Gonzalez, an experienced gang officer and a primary LAPD investigator of the Harpy's gang since 2006. Officer Gonzalez attested to two predicate offenses committed by Harpy's members that occurred within the same time period as the charged offense; a robbery in 2007 and a murder in 2008, both of which are statutorily enumerated offenses. (Pen. Code, § 186.22, subd. (e)(2) & (3).) Officer Gonzalez was the arresting officer in both of those cases, and therefore attested to them from his own personal knowledge. He also identified the court records presented by the prosecutor referencing both offenses.

Officer Gonzalez attested to his extensive personal knowledge from having investigated hundreds of crimes related to Harpy's, and his arrest of numerous Harpy's members during the relevant time period for crimes such as robbery, narcotics sales, extortion, attempted murder and murder. He opined that Harpy's was "actively" engaged in criminal activity. His opinion was based on his years of personal experience working on a gang detail with other gang officers, his "gang files" and other records maintained by the LAPD.

15

The evidence offered through Officer Gonzalez was bolstered and corroborated by the other gang officers who testified, as well as by Mr. Quiñonez, a former Harpy's member. Mr. Quiñonez attested to his membership in Harpy's for some two decades up through 2009, the year the charged offense was committed. He spoke from personal knowledge as to the gang's regular criminal activities which involved, in his opinion, "every crime that's thinkable," including robbery, stealing cars, attempted murders and murders. He admitted that as a member of Harpy's he was convicted of, and was incarcerated for, various crimes, including the attempted murder of a rival gang member.

In arguing insufficient evidence, defendant heavily relies on *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), and the fact that Officer Gonzalez responded "not regularly" when asked if all of the crimes he mentioned were regularly engaged in by Harpy's members.

In *Alexander L.*, the gang expert offered general testimony about the benefits graffiti provides to a gang and that the gang to which the defendant belonged had been in existence since the time of his arrest. (*Alexander L.*, *supra,* 149 Cal.App.4th at p. 611.) The expert also testified " 'I know [the gang has] committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Ibid.*) "No specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information." (*Id*. at pp. 611-612.) On cross-examination, the gang expert conceded that the majority of cases he was familiar with for the gang were "graffiti related." (*Id*. at p. 612.)

In concluding the record lacked substantial evidence, the *Alexander L.* court found the gang expert's testimony to be "conclusory," explaining, "[w]e cannot know whether the basis of [the gang expert's] testimony on this point was reliable, because information establishing reliability was never elicited from him at trial. It is impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Alexander L.*, *supra*, 149 Cal.App.4th at p. 612.)

16

The gang evidence below was nothing like the minimal evidence presented in *Alexander L.* Rather, it was similar to that offered and held sufficient in *Gardeley*. While Officer Gonzalez was not asked to explain what he meant by answering "not regularly" when asked if all of the crimes he mentioned were regularly engaged in by Harpy's members, the evidence of Harpy's criminal activities, considered in its totality, was ample and more than sufficient for the jury to find that the primary activities prong of the gang statute had been satisfied. (See, e.g., *People v. Vy* (2004) 122 Cal.App.4th 1209, 1225 [three serious, violent crimes, including the charged offense, by the gang's members over a period of three months sufficient to establish "primary activities" prong of the gang statute].) We find nothing in the language of the gang statute or in *Sengpadychith* that would support the conclusion that evidence of the type presented below was insufficient to show the requisite level of criminal activity by Harpy's members and Harpy's status as a recognized "criminal street gang."

## 2. The Prior Uncharged Crime Evidence

Defendant contends he was denied due process and a fair trial because the court erroneously admitted evidence of the prior uncharged April 17, 2009 shooting incident without an appropriate instruction regarding the burden of proof. Specifically, defendant argues the jury was improperly instructed that it could consider the prior incident to show a pattern or plan, and that the prosecution only had to establish the prior incident by a *preponderance of the evidence*. Defendant contends the instruction violated applicable law and lessened the prosecution's burden of proof. In so arguing, defendant relies on *People v. Lucas* (2014) 60 Cal.4th 153 (*Lucas*)[6] for the proposition that the jury should have been instructed that the prior incident had to be proven *beyond a reasonable doubt* before the jury could use that evidence to raise any inference as to the current charge.

"It is well settled that evidence of other crimes presented in the guilt phase of a criminal trial may be proved by a *preponderance of the evidence*." (*People v. Rogers*

---

[6] Disapproved in part on other grounds as stated in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.

17

(2013) 57 Cal.4th 296, 338, italics added; see also 1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 82, p. 467.) On this issue, the trial court correctly instructed the jury with CALJIC No. 2.50 (Evidence of Other Crimes), CALJIC No. 2.50.1 (Evidence of Other Crimes by the Defendant Proved by a Preponderance of the Evidence), and CALJIC No. 2.50.2 (Definition of Preponderance of the Evidence).

Defendant's reliance on *Lucas* is misplaced as it does not purport to alter that longstanding rule. *Lucas* was a capital case involving multiple murder charges. An exception to the rule that other crimes evidence may be proved by a preponderance standard is when such evidence is used as aggravating factors pursuant to Penal Code section 190.3 *in the penalty phase of a capital case*, as it was in *Lucas*. (*Lucas*, *supra*, 60 Cal.4th at p. 315 [evidence of 1973 rape conviction used as aggravating factor].) When used for that purpose, other crimes evidence must be proved beyond a reasonable doubt. (See, e.g., *People v. Avena* (1996) 13 Cal.4th 394, 429-430; *People v. Robertson* (1982) 33 Cal.3d 21, 53.) That exception obviously has no applicability here.

However, defendant also cites to language from *Lucas* discussing the use of other crimes evidence during the *guilt phase* of the trial, language that does refer to the applicability of the reasonable doubt standard. But, once again, defendant's reliance on *Lucas* is misplaced.

The *Lucas* court's discussion of other crimes evidence at pages 282 through 284 is in the context of explaining the propriety of the jury instructions on the cross-admissibility of evidence where multiple murder counts had been consolidated for trial. The defendant in *Lucas* had been charged, in separate actions, with multiple murders that had occurred over a period of time. The prosecution successfully moved to have all the murder charges consolidated for trial because of the cross-admissibility of evidence showing a unique wound pattern to the victims' throats caused by the distinctive manner in which the killer used a knife. Thus, the "other crimes" evidence presented during the guilt phase of the trial involved separate *charged offenses*. As such, the jury was instructed, in relevant part, that " '[e]vidence has been introduced in this case of more than one count of homicide. As you have been instructed, each count charged must be

decided separately.  However, you may, if you so choose, use evidence from other counts together with any count under consideration for certain limited purposes.' " (*Lucas*, *supra*, 60 Cal.4th at p. 283, fn. 48.)  The jury was told it could consider such evidence to raise an inference regarding the identity of the perpetrator, intent, motive, or the existence of a common plan or scheme in the commission of the offenses.  (*Id*. at pp. 283-284.)

Lucas rejected the defendant's contention that the instructions on cross-admissibility allowed the jury to make inferences about his guilt without finding the facts of each other crime by the requisite reasonable doubt standard.  (*Lucas*, *supra*, 60 Cal.4th at p. 284.)  *Lucas* did affirm that the reasonable doubt standard was appropriate there because each "other crime" was a separate *charged* murder count upon which the prosecution was required to establish defendant's guilt beyond a reasonable doubt.  *Lucas* did not purport to change the general rule regarding use of the preponderance standard for prior *uncharged* crime evidence.  The *Lucas* court's discussion in this regard is therefore wholly irrelevant to this case.

### 3.    The Premeditation Finding

Defendant contends the jury's finding that the attempted murder was premeditated must be reversed because he was convicted solely on an aiding and abetting theory and there was no evidence he *personally* premeditated the offense, nor was the jury instructed that it must find he *personally* premeditated in order to find him guilty of attempted murder in the first degree.  Defendant contends the giving of CALJIC No. 8.67 was error because it did not instruct the jury it had to find that he personally premeditated, and that the verdict form suffered from the same defect.  The argument rests on a misstatement of the applicable law.

As relevant here, Penal Code section 664, subdivision (a) increases the punishment for an attempted murder from five, seven or nine years to life in prison with the possibility of parole, if the attempted murder was premeditated.  In *People v. Lee* (2003) 31 Cal.4th 613, 626 (*Lee*), the Supreme Court interpreted the statutory language and determined the statute "does *not* require that an attempted murderer personally act with willfulness, deliberation, and premeditation.  It requires only that the attempted

19

murder itself was willful, deliberate, and premeditated." Thus, so long as there is evidence the murder attempted was premeditated, there need not be evidence that an aiding and abetting defendant personally premeditated the crime. A defendant who directly aids and abets an attempted premeditated murder is subject to a life term, the same as the direct perpetrator. (*Ibid.*)

In so concluding, the Supreme Court rejected the defendant's argument that the Legislature could not have intended to punish with life imprisonment an attempted murderer who is guilty only under an aiding and abetting theory if that defendant did not also *personally* premeditate the crime. The court reasoned, "the Legislature reasonably could have determined that an attempted murderer who is guilty as an aider and abettor, but who did not personally act with willfulness, deliberation, and premeditation, is sufficiently blameworthy to be punished with life imprisonment." (*Lee*, *supra*, 31 Cal.4th at p. 624.) A defendant who directly aids and abets an attempted murder, "necessarily acts willfully, that is with intent to kill. In addition, he or she also necessarily acts with a mental state at least approaching deliberation and premeditation . . . because he or she necessarily acts with knowledge of the direct perpetrator's intent to kill and with a purpose of facilitating the direct perpetrator's accomplishment of the intended killing. Punishing such an attempted murderer with life imprisonment would not run counter to [Penal Code] section 664(a)'s purpose of making the punishment proportionate to the crime." (*Ibid.*, citations omitted.)

The court's more recent pronouncement in *People v. Chiu* (2014) 59 Cal.4th 155 did not alter California law regarding the crime of attempted murder under direct aiding and abetting principles as articulated in *Lee*. As relevant here, *Chiu* determined a defendant found liable for aiding and abetting a murder under the *natural and probable consequences doctrine* may only be held liable of murder in the second degree. "[P]unishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Chiu,* at p. 166.) In so concluding, the Supreme Court explained that an aider and abettor may

20

still properly be held liable for first degree murder under the felony murder rule or under direct aiding and abetting principles. (*Id*. at pp. 166-167.)

Accordingly, the giving of CALJIC No. 8.67 and the language of the verdict form were *not* defective under California law. Defendant nonetheless raises the specter of a federal constitutional deprivation, citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), and *Alleyne v. United States* (2013) __ U.S. __ [133 S.Ct. 2151] (*Alleyne*). Defendant argues that since Penal Code section 664, subdivision (a) is a penalty provision that increases the punishment for attempted murder in the first degree, *Apprendi* and *Alleyne* mandate that the jury resolve the factual question of defendant's premeditation.

In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.) *Alleyne* extended the logic of *Apprendi* to statutory minimum sentence provisions. "Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. [Citation.] Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." (*Alleyne*, *supra*, 133 S.Ct. at p. 2155.)

Neither *Apprendi* or *Alleyne* purport to change California law regarding the required elements for an attempted murder charge or a premeditation finding. They only require that any fact or element prescribed *by state law* that increases the penalty for a crime be resolved by a jury. As explained above, California law *does not require*, as an element of attempted murder in the first degree, the *personal* premeditation of a defendant liable under direct aiding and abetting principles. (*Lee*, *supra*, 31 Cal.4th at p. 626.)

California law *does require* the jury to resolve the allegation whether the *murder attempted* was premeditated. And, the record here shows the jury was properly instructed and found that allegation to be true. The evidence established that defendant deliberately

21

drove two accomplices into territory claimed by MS, a rival gang, dropped them off, and then waited for their return. Strong evidence of motive and premeditation was raised by evidence the two accomplices then executed a classic gang challenge and shooting. After shooting the victim multiple times at close range, the two accomplices ran back to defendant's truck which was described by witnesses as "waiting" for them. Defendant then drove quickly away from the scene. There was substantial evidence supporting the jury's finding that the attempted murder was premeditated. There was no violation of *Apprendi* or *Alleyne*.

## 4. The Modified Duress Instruction

Defendant contends the trial court's instruction of the jury with a modified version of CALJIC No. 4.40 was error. The instruction told the jury that the defense of duress does not apply to the crime of attempted murder.[7] Defendant contends the instruction deprived him of his constitutional right to present a defense, to due process, and to a fair trial. He further argues it was structural error mandating a reversal, or alternatively was prejudicial beyond a reasonable doubt. We are not persuaded.

In *People v. Anderson* (2002) 28 Cal.4th 767 (*Anderson*), the Supreme Court held that "duress is not a defense to any form of murder," nor does it reduce murder to manslaughter. (*Id.* at pp. 770, 780-784.) The Court reasoned, in part, that if duress was recognized as a defense "to the killing of innocents, then a street or prison gang need only create an internal reign of terror and murder can be justified, at least by the actual killer. Persons who know they can claim duress will be more likely to follow a gang order to kill instead of resisting than would those who know they must face the consequences of

---

[7] The jury was instructed: "A person is not guilty of a crime other than attempted murder when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: [¶] 1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and [¶] 2. If this person then actually believed that his life was so endangered. [¶] This rule does not apply to threats, menaces, and fear of future danger to his life, nor does it apply to the crime of attempted murder."

22

their acts.  *Accepting the duress defense to any form of murder would thus encourage killing.*"  (*Id.* at pp. 777-778, italics added.)

*Anderson* was reaffirmed in *People v. Vieira* (2005) 35 Cal.4th 264, 290:  "We decline defendant's invitation to reconsider the holding in *Anderson*.  Moreover, because duress cannot, as a matter of law, negate the intent, malice or premeditation elements of a first degree murder, we further reject defendant's argument that duress could negate the requisite intent for one charged with aiding and abetting a first degree murder."

*Anderson* did not specifically discuss the duress defense with respect to a charge of *attempted* murder, but we need not resolve whether the defense is applicable.

Assuming, without deciding, that a duress defense may be asserted to an attempted first degree murder charge, the evidentiary record in this case simply does not support the applicability of the defense.  As explained in part 3, *ante*, California law provides that an aider and abettor may be liable for first degree attempted murder even if he or she did not personally premeditate, so long as there is evidence the murder attempted was premeditated. (*Lee*, *supra*, 31 Cal.4th at p. 626.)  Here, the relevant evidence of premeditation concerned the conduct of defendant's accomplices who actually confronted J.A. and carried out the shooting.  The verdict reflects the jury plainly found that evidence supported the finding that the attempted murder was a premeditated gang attack on a suspected rival.  As to defendant's intent, the jury had only to conclude he intended to, and did, "give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing."  (*Id.* at p. 624.)

Defendant's contention he was entitled to an instruction on duress is belied even by his own testimony.  Defendant testified to a general fear of Shaggy as a "hardcore" gang member.  Defendant denied willfully participating in the shooting and that he only gave Shaggy and his accomplice a ride from the scene under duress.  But, defendant testified he saw no weapons and was not threatened by either Shaggy or his accomplice. He said only that he believed Shaggy would hurt him the next time he saw him.  "Duress is an effective defense only when the actor responds to an immediate and imminent

23

danger. '[A] fear of *future* harm to one's life does not relieve one of responsibility for the crimes he commits.' [Citations.]" (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.) There was no evidence defendant acted under a threat of "immediate and imminent danger."

Relying on *People v. Burney* (2009) 47 Cal.4th 203, defendant next argues that even under *Anderson*, a duress defense applies to the element of premeditation, providing not a complete justification but a basis for reducing first degree to second degree murder. *Burney* reaffirmed *Anderson* but explained "[n]onetheless, duress may negate the deliberation or premeditation required for first degree murder, and an instruction such as the one requested by defendant *may be appropriate if warranted by the circumstances of the case.*" (*Burney,* at p. 249, italics added, citing *Anderson*, *supra*, 28 Cal.4th at p. 784 [affirming trial court's refusal to instruct with duress because no evidence showed the defendant was threatened before he shot the victim].)

As already explained, there was no substantial evidence demonstrating defendant acted under duress. Therefore, the trial court did not err in declining to instruct the jury it could consider the defense as to the premeditation allegation.

5.      **The Failure to Instruct Sua Sponte on the Defense of Necessity**

Defendant contends the trial court erred by failing to sua sponte instruct on the defense of necessity. We find no error because the defense finds no support in the evidence presented at trial.

A trial court's sua sponte duty to instruct on a particular defense arises *only* where there is *substantial evidence* supporting the defense. " ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) This includes the obligation to instruct "on recognized 'defenses . . . and on the relationship of these defenses to the elements of the charged offense.' [Citation.]"

24

(*People v. Rubalcava* (2000) 23 Cal.4th 322, 334.)  The court's sua sponte duty to instruct on a defense is narrower than its duty to instruct on lesser included offenses. (*People v. Barton* (1995) 12 Cal.4th 186, 195.)  As to any particular defense, "a sua sponte instructional duty arises 'only if it appears that the defendant is relying on such a defense, *or if there is substantial evidence supportive of such a defense* and the defense is not inconsistent with the defendant's theory of the case.' [Citation.]" (*Breverman*, at p. 157, italics added.)

"The defense of necessity generally recognizes that ' "the harm or evil sought to be avoided by [the defendant's] conduct is greater than that sought to be prevented by the law defining the offense charged." [Citation.]'  The defendant, who must have possessed a reasonable belief that his or her action was justified, bears *the burden of proffering evidence of the existence of an emergency situation involving the imminence of greater harm that the illegal act seeks to prevent.*"  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 100, italics added (*Coffman*).)  "The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime.  It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile."  (*People v. Beach* (1987) 194 Cal.App.3d 955, 971.)

Defendant does not cite any authority that a necessity instruction is a lawful defense to a charge of attempted first degree murder.  The Supreme Court in *Coffman* rejected a claim that an instruction on necessity should have been given on a murder count.  The court noted that the defendant had not sought the instruction, there was no evidence supporting the defense, and then quoted the policy rationale of *Anderson* discussed in part 4 above disallowing duress as a defense to murder.  (*Coffman*, *supra*, 34 Cal.4th at p. 100.)  Given the similarity between the two defenses, we do not find the defense applies here.  Moreover, as discussed in part 4, *ante*, defendant's own testimony undercut the existence of any "emergency situation involving the imminence of greater harm" to defendant.  (*Ibid.*)

25

### 6. The Prosecutor's Closing Argument

Defendant contends the prosecutor committed misconduct during closing argument by misstating the law regarding premeditation. Respondent argues defendant forfeited the issue by failing to object to the prosecutor's argument in the trial court.

"When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal." (*People v. Morales* (2001) 25 Cal.4th 34, 43-44 (*Morales*); accord, *People v. Turner* (2004) 34 Cal.4th 406, 432 [failure to object or seek court's admonition to numerous comments by prosecutor vouching for the credibility of expert witnesses and expressing his personal admiration for their integrity resulted in forfeiture of claim on appeal].) Forfeiture is justified because the failure to timely object to improper argument deprives the trial court of an "opportunity to consider the objection and give appropriate admonitions when the alleged misconduct first occur[s], or to prevent additional remarks of a similar nature from being made." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)

As defendant concedes, no objections were raised by the defense in the trial court to the prosecutor's argument regarding the law related to premeditation and deliberation. Defendant therefore forfeited his objections on this ground.

In any event, even if considered on the merits, the contention lacks merit. Our Supreme Court has summarized the standards for evaluating a claim of prosecutorial misconduct as follows. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it *infects the trial with such unfairness as to make the conviction a denial of due process*. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the *use of deceptive or reprehensible methods* to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, *when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion*." (*Morales*, *supra*, 25 Cal.4th at p. 44, italics

26

added; accord, *People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203.)  In assessing the prosecutor's argument, we must not lose sight of the "presumption that 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'  [Citation.]"  (*Morales*, at p. 47.)

Defendant contends the following passage in the prosecutor's closing argument was improper:  "Under the law, deliberation and premeditation can be within a split second. . . .  [¶]  . . . Think about [it] in our everyday lives. . . .  [Y]ou are actually driving your car and you are coming up to a stoplight and it's yellow.  And you are deciding, 'should I run the light, should I try to make, or should I wait until it turns red?'  [¶]  All of these thoughts go through your head.  'If I run the light and I hit someone, I could hurt them.'  'If I run the light, a cop would be waiting and I could get a ticket.'  'If I don't run the light, I'm going to be late for school and I'm not going to be able to pick up my kid.'  'If I run the light,' on and on and on.  All of those things go through your head within a split second.  Under the law that's what premeditation and deliberation is."  Defendant contends the prosecutor's argument urging the jury it could find the requisite premeditation occurred within a "split second" was a "gross" misstatement of the law.

Contrary to defendant's argument, California law does not specify any minimum amount of time that must be found by the jury in order to support a premeditation finding.  It is well established that " ' "[p]remeditation and deliberation can occur in a brief interval.  'The test is not time, but reflection.  "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' "  [Citation.]' [Citation.]"  (*People v. Solomon* (2010) 49 Cal.4th 792, 812; see also CALJIC No. 8.67 ["The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.  The time will vary with different individuals and under varying circumstances"].)  Despite defendant's suggestion to the contrary, the law in this regard has not changed.

The prosecutor's argument was within the realm of an advocate's fair characterization of the applicable law of premeditation, and therefore did not constitute

27

error or misconduct.  Since we conclude there was no misconduct or improper argument by the prosecutor, we need not consider defendant's contention that his defense counsel provided ineffective assistance for failing to object to such argument.

**7.    Cumulative Error**

Because we conclude none of defendant's individual claims of error are meritorious, there is no basis for discussing cumulative error.

**DISPOSITION**

The judgment of conviction is affirmed.

GRIMES, J.

WE CONCUR:

FLIER, Acting P. J.

OHTA, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.